*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| MOLLY O., | ) | |
| | ) | Supreme Court No. S-15076 |
| Appellant, | ) | |
| | ) | Superior Court Nos. |
| v. | ) | 4FA-11-00003/00004/00005 CN |
| | ) | |
| STATE OF ALASKA, | ) | O P I N I O N |
| DEPARTMENT OF HEALTH & | ) | |
| SOCIAL SERVICES, OFFICE OF | ) | No. 6877 – March 14, 2014 |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| _____ | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Douglas Blankenship, Judge.

Appearances: James H. Cannon, Law Office of James H. Cannon, Fairbanks, for Appellant. Jacqueline G. Schafer, Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

STOWERS, Justice.

I.      INTRODUCTION

In January 2011 the Department of Health and Social Services, Office of Children's Services (OCS) took emergency custody of three children. The children had

been in the care of their maternal grandparents beginning in October 2010, but before their removal had returned to their parents. OCS, under the impression that the children were being cared for by the parents at the time of removal, placed the children with the maternal grandparents.

On August 13, 2012, the day the trial to terminate the mother's parental rights was to begin,[1] the mother moved to have the grandmother joined in the proceeding as the children's Indian custodian. The trial court appointed counsel for the grandmother, who moved to intervene. After holding an evidentiary hearing, the trial court found that the children had been removed from the grandparents' custody and that the grandmother had thus been their Indian custodian at the time of removal. However, the court denied both the mother's motion to join the grandmother and the grandmother's motion to intervene, finding that shortly after the removal the parents revoked the grandmother's Indian custodian status by asking OCS not to place the children with her.

The grandmother moved for reconsideration and argued that her due process rights were violated at the time of the removal. She argued that OCS did not provide her with notice of the right she was entitled to as the children's Indian custodian, including notice of her right to intervene in the proceeding and of her right to be represented by counsel. The trial court rejected this argument, finding that although OCS breached its duty to provide the grandmother with notice required by the Indian Child Welfare Act (ICWA),[2] because of the short time between the children's removal and the parents' revocation of the grandmother's status as the children's Indian custodian the grandmother had suffered no significant detriment to her rights.

---

[1]    The children's father relinquished his parental rights.

[2]    25 U.S.C. §§ 1901-1963 (2006).

We affirm the trial court's decision and hold that any error OCS may have made regarding the notice provisions of ICWA was harmless.

## II.     FACTS AND PROCEEDINGS

Jessica and Aaron R. have three children, Ashley, Mark, and Lori, who are Indian children for purposes of ICWA.[3] For much of the children's lives the family lived with Jessica's parents, Molly and Chuck, in Molly and Chuck's home. In spring 2010 Jessica, Aaron, and the children moved out of that home. It appears that Jessica and Aaron separated and Jessica moved in with a boyfriend, Doug, while the children stayed with Aaron in a home with several other adults. Uncomfortable with this situation, Jessica asked her parents to take care of the children until she and Aaron could get on their feet financially. In late October 2010 the children returned to Molly and Chuck's home. In early January 2011 the children spent several days in a home that Aaron was sharing with Jessica and Doug. Whether the stay was intended to be a permanent return to their parents or a mere visit is the subject of conflicting evidence, the bulk of which supports the trial court's finding that the stay was intended as a visit. On January 10, 2011, the children returned to Molly and Chuck's home.[4] That day Lori complained to Molly about discomfort in her genital region. Molly took her to the emergency room and, on the advice of hospital personnel, the next day took all three children to be interviewed at Stevie's Place.[5] While Lori's complaints initially raised

---

[3]     We use pseudonyms to protect the privacy of the family.

[4]     Again, the evidence differs as to whether their return was intended as a visit or as a continuation of an indefinite placement with the grandparents.

[5]     Stevie's Place is a facility-based program that provides forensic interviews and medical exams in a child-friendly setting when there is reason to believe a child has been sexually abused. RESOURCE CENTER FOR PARENTS AND CHILDREN: STEVIE'S
(continued...)

concerns about sexual abuse, she ultimately turned out to have been suffering from a yeast infection.

OCS quickly became involved. Believing the children to have been living with their parents, on January 11, 2011, OCS devised a protective action plan under which the children were placed with Molly and Chuck, who agreed to not allow Jessica to remove the children from their home or allow her to have unsupervised contact with them. The next day OCS filed an emergency petition to adjudicate the children as children in need of aid and it took them into emergency custody, while maintaining their placement with Molly and Chuck. The emergency adjudication petition alleged that the children had been living in their parents' home at the time of removal.

On January 14, 2011, OCS held a team decision-making meeting (TDM).[6] The purpose of the meeting was to determine the children's placement and to explore issues involving the children's hygiene, safety, and medical needs. The meeting was attended in person by, among other participants, Jessica, Aaron, Molly, and Chuck, and telephonically by Aaron's half-brother, Joseph Frederick, and Joseph's wife, Carol.[7] At

---

[5](...continued)
PLACE, http://www.rcpcfairbanks.org/stevies_place.php (last visited Feb. 10, 2014).

[6]      According to OCS social worker Natosha Malone a TDM provides "an arena where we can invite the family along with any supports to openly discuss the concerns that [OCS] has and to develop a plan for placement. . . .  We document the strengths, the concerns, the ideas, and then hopefully bring the group to consensus by the end of the meeting."  If the team is unable to reach consensus on placement, OCS's recommendation is implemented, but the participants are informed that they may contest the decision in court.

[7]      The children would eventually be placed with the Fredericks in North Carolina in October 2011, where they remain.

the meeting the team agreed that the children would remain placed in unlicensed relative care with Molly and Chuck.

Later that day the trial court held an emergency probable cause hearing. At the hearing, which was attended by Jessica and Aaron, but not Molly or Chuck, Aaron's attorney stated that Aaron was concerned about drinking occurring in Molly and Chuck's home. OCS informed the trial court that placement with Molly and Chuck had been decided at a TDM, and that another TDM, to review the placement while avoiding the need for a judicial hearing, had been scheduled for the following week. At the termination trial Malone testified that the second TDM was scheduled because Jessica and Aaron disagreed with OCS's decision to place the children with Molly and Chuck.

The second TDM was attended in person by Jessica and Aaron and their attorneys, and telephonically by the Fredericks. Molly and Chuck did not attend. Jessica and Aaron each expressed concerns about the children's placement with Molly and Chuck. Their concerns included suspicions about Chuck having been a perpetrator of sex abuse, safety issues involving power tools in the home, drinking in the home, and Jessica having blocked details of her childhood from her memory, suggesting that Jessica had suffered abuse by her parents. At a later hearing Malone testified about the second TDM. She stated that at the meeting she had not heard Jessica specifically ask OCS to remove the children from Molly and Chuck, but that Jessica "wanted them moved." Malone stated that "[u]nder no circumstances was I under any impression that [Jessica] wanted her kids to remain with [Molly and Chuck]."[8] Despite the concerns, the children remained placed with Molly and Chuck.

---

[8]     Malone testified that she felt that Jessica appeared more comfortable speaking openly outside her parents' presence. Malone testified that Jessica told the group that her childhood "must have been really bad if I've blocked it out," and that Malone found Jessica's statements to be "bone chilling."

According to social worker Justin Heminger, who took over the case in spring 2011, another TDM was held in June 2011, shortly after he visited Molly and Chuck's home. The purpose of the TDM was to consider whether to change the children's placement. Heminger was concerned about the condition of the home, including strong odors of cigarette smoke and cat urine, power tools, heavy boxes stacked against the walls, clutter, overloaded dishes and ash trays, and auto parts in the yard. The team decided to continue the placement for two weeks to allow Molly and Chuck to alleviate the concerns. Following the TDM Molly and Chuck remedied most, but not all, of OCS's concerns about the home's conditions.

But OCS continued to have concerns about the placement, which the children's guardian ad litem (GAL) had opposed since the beginning. According to Heminger, OCS's ongoing concerns included cleanliness, discipline issues, Lori's continuing yeast infection, discontinuance of Lori's counseling, drinking, and neglect. Another TDM was held in August 2011, at which the team decided to place the children with their paternal relatives, the Fredericks, in North Carolina.[9] But because that placement could not occur immediately, and the team determined that the children required immediate removal from Molly and Chuck's care, the children were temporarily placed in a local foster home before moving to the Frederick home in October 2011.

Molly and Chuck requested a review hearing to contest the change of placement. OCS, the GAL, and Aaron opposed the request while Jessica took no position. On September 1, 2011, the trial court held a proceeding to consider the request. On September 8, 2011, the trial court announced its decision that because Molly and Chuck were not parties to the child in need of aid (CINA) proceeding they were without

[9] Attending this meeting were Jessica, Aaron, Chuck, representatives of Eagle and Tanana Chiefs Conference, and the GAL. Molly did not attend. According to Malone all of the participants supported the change in placement.

standing to challenge OCS's placement decision. Molly and Chuck did not appeal the ruling.

A trial on OCS's petition to terminate Jessica's parental rights was scheduled to begin on August 13, 2012. That morning, Jessica's attorney filed a motion asking the trial court to allow Molly to join the case as a party, claiming that she was the children's Indian custodian from whose care and custody the children had been removed.[10] The attorney averred that the trial court could not terminate Jessica's parental rights because OCS was not prepared to prove that entrusting the children to Molly's custody would result in serious emotional or physical damage to them.[11] This was the first indication OCS had received from the parents or grandparents that Molly had been the children's Indian custodian at the time of removal. OCS's attorney stated on the record that OCS had been operating all along under the belief that the children had been living with, and in the custody of, their parents, not their grandparents, at the time of their removal.

The trial court appointed counsel to represent Molly and scheduled an evidentiary hearing on the Indian custodian issue. The hearing was held on October 5 and 8, 2012. Molly, Chuck, Jessica, and Doug testified, as did social workers Malone and Heminger. The Native Village of Eagle participated. The bulk of the evidence presented, including testimony by Molly, Chuck, Jessica, and Doug, indicated that the children had been temporarily visiting their parents in early January 2011 rather than having been returned to them permanently.

Following the hearing the trial court denied Molly's request to intervene and Jessica's request to join Molly as a party. The court found that the children had been

---

[10]     See 25 U.S.C. § 1912(a).

[11]     See 25 U.S.C. § 1912(f).

living with Molly and Chuck on January 12, 2011, when they were taken into OCS's custody. It concluded, based on this fact and on Jessica's temporary grant of physical care, custody, and control of the children to the grandparents, that Molly had been the children's Indian custodian at the time of their removal.[12] The court noted that there was conflicting evidence as to whether Jessica intended Molly's custodianship of the children to continue after the children were removed by OCS. It acknowledged Jessica's testimony that she did not tell OCS that she objected to the children's placement with her parents, that she never asked OCS to remove the children from her parents, and that she wanted the children to remain with her parents. But it found that Jessica's "testimony was somewhat inconsistent and hindered by lack of memory." It found more credible Malone's and Heminger's testimony that Jessica had repeatedly objected to the children's placement with her parents and had asked that the placement be changed. It found that Jessica "object[ed] to the placement with her parents commencing at least by January 18, 2011." The trial court concluded that Jessica's "desire to remove the children from [Molly and Chuck] act[ed] to terminate the Indian custodianship no later than the date the children were removed with Jessica's concurrence."[13]

Molly moved for reconsideration, arguing in part that the trial court's decision was erroneous because, having found her to have been the children's Indian custodian at the time of removal, "the court failed to address or recognize that the state had utterly failed to comply with the mandatory requirements for written notice imposed

---

[12]     25 U.S.C. § 1903 (6) defines "Indian custodian" to mean "any Indian person who has legal custody of an Indian child under tribal law or custom or under State law or to whom temporary physical care, custody, and control has been transferred by the parent of such child."

[13]     The trial court was referring to the children's removal from Molly and Chuck's home on August 18, 2011.

by CINA Rule 7(f) and 25 CFR 23.11(a)," and had thus deprived Molly of her statutory right to counsel, her right to intervene in her grandchildren's CINA proceeding, and her right to due process.[14]

The trial court denied Molly's motion. In doing so the court clarified its findings to specify that Molly's Indian custodianship ended on January 18, 2011, when Jessica and Aaron notified OCS that they disagreed with the decision to place their children with Molly and Chuck. The court found that OCS breached its duty to provide notice to Molly of her right to intervene in the proceeding and to be represented by counsel, as required by ICWA, but it found that, because Molly's status as an Indian custodian was extinguished six days after OCS took custody, OCS's actions had not deprived Molly of any important rights and the breach had thus been harmless.

Molly appeals, arguing that OCS's failure to provide her with notice due to an Indian custodian at the time the children were removed from her custody deprived her of her right to due process, and that the parents' revocation of Molly's Indian custodianship was ineffective until Molly received notice of the revocation. Molly asks us to reverse the trial court's denial of her request to intervene in the proceeding, to order the children restored to her physical care and custody, and to vacate all orders issued by the trial court since OCS's assumption of the children into its custody in January 2011.

---

[14] Molly argued that OCS erred by not providing her with notice of her rights as an Indian custodian under 25 C.F.R. § 23.11(a) and Alaska Child in Need of Aid Rule 7(f). Under the regulation and rule when OCS petitions to adjudicate an Indian child as a child in need of aid it must notify the child's parents, Indian custodians, and tribe of their rights under ICWA. Those rights include the right to intervene in the proceeding, the right to be represented by counsel, and the right to obtain a continuance to prepare for the proceeding. Additionally, the notice must include a statement of potential legal consequences of the proceeding on the future custodial or parental rights of the parents or Indian custodians.

## III. STANDARD OF REVIEW

We review a trial court's factual findings for clear error and its conclusions of law de novo.[15] A finding is clearly erroneous if, after reviewing the entire record in the light most favorable to the party prevailing at trial, we are definitely and firmly convinced that the finding is mistaken.[16]

## IV. DISCUSSION

### A. The Parents Ended Their Grant Of Temporary Custody To Molly, And Thus Molly's Indian Custodianship, In January 2011.

A parent whose child is in OCS's custody may, with the concurrence of OCS, revoke an Indian custodianship that was in place when OCS took custody of the child.[17] A parent may not create or recreate an Indian custodianship for a child in OCS's custody by transferring temporary physical care, custody, and control of the child to an Indian person because OCS, not the child's parent, is the legal custodian of such a child, with sole authority to direct the child's physical care, custody, and control.[18] OCS's placement of a child with an Indian person does not create an Indian custodianship.[19]

---

[15] *Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 961 (Alaska 2013) (citing *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1111 (Alaska 2010)).

[16] *Id*. at 961-62 (quoting *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 88 P.3d 527, 529 (Alaska 2004)).

[17] *Ted W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 333, 339 (Alaska 2009).

[18] AS 47.10.084(a); *see also In re J.J.*, 454 N.W.2d 317, 327 (S.D. 1990).

[19] 25 U.S.C. § 1903 (6) specifies that an Indian custodian relationship is created when "*the parent* of such child" has temporarily transferred physical care, custody, and control of the child to an Indian person. (Emphasis added).

At the time of the termination trial Jessica wanted Molly to be her children's Indian custodian. But Jessica and Aaron's earlier action in informing OCS of their opposition to the children being placed in Molly's care acted to terminate Molly's Indian custodianship. Despite her wishes at the time of the termination trial, Jessica was without authority to reinstate that relationship.

The trial court found that Jessica and Aaron ended Molly's Indian custodianship on January 18, 2011, by stating at a TDM that they did not want the children placed with Molly and Chuck. On appeal, Molly argues that any such sentiment by the parents was ineffective to end Molly's Indian custodial relationship because the parents' intention was not communicated to Molly. But Molly misses a key point. Under section 1912(a) of ICWA, it is "the party seeking the foster care placement of . . . an Indian child" who "shall notify the parent or Indian custodian and the Indian child's tribe" of the pendency of the proceeding and of the parent's, Indian custodian's, or tribe's right of intervention. Here, the party responsible for providing such notice was OCS. By telling OCS on January 18, 2011, that they did not want their children placed with Molly, Jessica and Aaron effectively informed OCS that any grant of physical care, custody, and control they may have earlier given Molly over their children no longer existed. Regardless of Molly's knowledge, or lack thereof, of this communication, OCS was the party charged with notifying the children's Indian custodian, if any, of the pendency of the CINA proceeding. Jessica and Aaron's statements gave OCS actual knowledge that, as of January 18, 2011, Molly was not the children's Indian custodian. OCS thus had no duty, from that time forward, to provide Molly with notice under ICWA.[20]

---

[20] Molly argues that OCS breached not only a duty to provide her with notice of her rights as the children's Indian custodian, but also a preliminary duty to inquire into
(continued...)

Once an Indian custodian's status has been revoked, that person has no role in ongoing child protection proceedings. By way of illustration, in *In re G.L.*,[21] a grandmother informed the state social services agency and the trial court that she was a child's Indian custodian after the trial court had issued jurisdictional findings.[22] The grandmother's disclosure of her status triggered the agency's duty to provide her with

---

[20](...continued)
her status as such. OCS responds that the facts available at the time gave it no reason to suspect that an Indian custodianship may have existed in this case, and thus it had no duty to inquire into Molly's status. We note the statement of the Michigan Supreme Court:

> While it is impossible to articulate a precise rule that will encompass every possible factual situation, in light of the interests protected by ICWA, the potentially high costs of erroneously concluding that notice need not be sent, and the relatively low burden of erring in favor of requiring notice . . . the standard for triggering the notice requirement of 25 U.S.C.A. 1912(a) must be a cautionary one. . . .

*In re Morris*, 815 N.W.2d 62, 64-65 (Mich. 2012). Here, the trial court correctly concluded that the short period of time between the children's removal and the parents' revocation of Molly's Indian custodian status rendered any error OCS may have made in not providing Molly with notice of her rights under ICWA harmless. The same analysis compels a conclusion that any error OCS may have made by not inquiring into Molly's status was also harmless. Thus, we need not and do not decide whether, given the facts available at the time, OCS had a duty to inquire into Molly's status, and, if so, whether it violated that duty.

[21]     99 Cal. Rptr. 3d 356 (Cal. App. 2009).

[22]     *Id*. at 360.

notice under ICWA.[23] The agency did not provide the required notice, but before any further substantive proceedings occurred in the case, the mother revoked her grant of custodianship to the grandmother.[24] The mother later recanted her revocation and expressed her desire to have the grandmother's Indian custodian status reinstated. The appellate court held that once the grandmother's "Indian custodian status was revoked, the notice provisions of ICWA no longer applied to her, regardless of [the parent's] intent to the contrary."[25] The court held that while the agency erred in failing to provide the Indian custodian with notice, the error was harmless.[26] The court concluded, "[G]iven the unusual procedural posture in which we address the issue of notice to an Indian custodian, even a conditional reversal and remand for further ICWA notice would be futile, an empty formality and a waste of ever-more-scarce judicial resources."[27] We agree with the rationale of *G.L.*

The trial court's factual finding that Jessica objected to the children's placement with Molly and Chuck on January 18, 2011, is supported by the record and thus not clearly erroneous. The trial court's conclusion from this finding that Jessica's desire to remove the children from Molly and Chuck acted to terminate Molly's Indian custodianship is not erroneous. And the court's determination that OCS's failure to provide notice of the rights of an Indian custodian to Molly was harmless given that

---

[23] *Id*. at 365-66.

[24] *Id*. at 362, 366.

[25] *Id*. at 366.

[26] *Id*. at 366-67.

[27] *Id*. at 367 (quoting *In re E.W.*, 88 Cal. Rptr. 3d 338, 343 (Cal. App. 2009)).

Molly's Indian custodianship was terminated six days after OCS took custody is also not erroneous.

**B.     Molly's Other Arguments Are Without Merit.**

Molly argues that Jessica created an Indian custodianship in her by executing powers of attorney for the children, and that because Jessica did not revoke the powers of attorney Molly's status as the children's custodian was never revoked. She argues that because she was not informed that the powers of attorney had been revoked OCS was required to treat her as the children's custodian, even though Jessica directly told OCS that she opposed Molly's custodianship. But, by informing OCS that she opposed Molly's exercise of custody over the children, Jessica revoked, at least as far as OCS's relationship with Molly was concerned, any indicia of custody that Molly had acquired through the powers of attorney. By their terms, the powers of attorney were "revocable by [Jessica] at any time." Molly's argument thus has no merit.

Finally, Molly argues that because OCS violated its duty under section 1912 of ICWA[28] to provide her with notice of the CINA proceeding and of her right to intervene in it, section 1914[29] of ICWA mandates that all of the trial court's orders following the children's removal must be vacated, the case must be reset to its status at the time of the removal, and the children must be returned to Molly's physical custody. We reject this argument because of our holding that OCS's error in not providing notice to Molly was harmless.

## V.     CONCLUSION

For the foregoing reasons the trial court's denial of Molly's request to intervene in the children's CINA proceeding is AFFIRMED.

---

[28]     25 U.S.C. § 1912 (2006).

[29]     25 U.S.C. § 1914 (2006).

BOLGER, Justice, dissenting.

The Indian Child Welfare Act creates important procedural rights for Indian custodians.[1] For example, in any state court involuntary proceeding involving an Indian child, "the party seeking the foster care placement of, or termination of parental rights to" that child must provide notice to the Indian custodian of the proceedings and of his or her right to intervene,[2] and an indigent Indian custodian has a statutory right to court-appointed counsel.[3]

Here, the superior court ultimately concluded that Molly was an Indian custodian for ICWA purposes at the time OCS filed its initial petition. In my view, Molly's Indian custodian status should have been apparent after minimal inquiry because (1) the children had been living with her for months, (2) Molly brought the children to the attention of OCS, and (3) OCS immediately returned the children to her care. The superior court should have appointed counsel to represent Molly at the very first hearing and provided notice to all parties of Molly's status as an Indian custodian.

However, this court's decision reasons that the superior court's failure to provide notice and counsel to Molly was harmless because Aaron and Jessica objected to Molly's custodianship at a meeting with OCS a few days later. I respectfully disagree with this conclusion.

If the court had properly recognized Molly's status and appointed counsel for her, then the course of the following proceedings may well have been much different. Aaron and Jessica may have realized the benefits of continuing Molly's status as an Indian custodian. Molly may have chosen to participate in the team decision meetings

---

[1] See 25 U.S.C. § 1912 (2013).

[2] § 1912(a).

[3] § 1912(b).

where the parties discussed the children's placement. And with competent representation, Molly would have recognized her statutory right to judicial review of OCS's later decision to remove the children from her care.[4]

In a criminal case, interference with a defendant's right to counsel is often considered to be a structural error that requires reversal because the consequences of such an error "are necessarily unquantifiable and indeterminate."[5] Similar considerations leave me skeptical about this court's conclusion that there was no harmful consequence from the failure to appoint counsel for Molly. I respectfully dissent.

---

[4]     *See* AS 47.14.100(m); *Irma E. v. State, Dep't of Health & Soc. Servs.*, 312 P.3d 850, 853-54 (Alaska 2013).

[5]     *Cook v. State*, 312 P.3d 1072, 1088 (Alaska 2013) (Maassen, J., dissenting) (quoting *United States v. Gonzalez–Lopez*, 548 U.S. 140, 150 (2006)); *see also McKinnon v. State*, 526 P.2d 18, 24 (Alaska 1974).