NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

# THE SUPREME COURT OF THE STATE OF ALASKA

ROMAN G.,

                Appellant,

   v.

STATE OF ALASKA, DEPARTMENT OF FAMILY & COMMUNITY SERVICES, OFFICE OF CHILDREN'S SERVICES and PHOEBE G.,

                Appellees.

Supreme Court No. S-18848

Superior Court Nos.
3PA-20-00151/00152/00153/00154 CN
(Consolidated)

MEMORANDUM OPINION
AND JUDGMENT*

No. 2105 – August 27, 2025

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Kristen C. Stohler, Judge.

Appearances: Michael L. Horowitz, Law Office of Michael Horowitz, Kinsley, Michigan, for Appellant. Katherine Demarest, Assistant Attorney General, Anchorage, and Treg Taylor, Attorney General, Juneau, for Appellee State of Alaska. Olena Kalytiak Davis, Anchorage, for Appellee Phoebe G. Sergio Barron, Assistant Public Advocate, Palmer, and James Stinson, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: Carney, Chief Justice, and Borghesan, Henderson, Pate, and Oravec, Justices.

---

\*      Entered under Alaska Appellate Rule 214.

# I.    INTRODUCTION

The Office of Children's Services (OCS) took four siblings into its custody after daycare workers discovered significant bruising on one of the children. An investigation indicated that the children's father was responsible for the bruising and revealed additional significant concerns regarding the father's conduct toward the children and their mother. As the child in need of aid (CINA) case ensued, the father asserted that his appointed attorney was ineffective, and he requested and was granted numerous representation hearings over the course of 15 months to litigate the issue. The superior court ultimately rejected the father's claims of ineffectiveness but granted his request to appoint conflict counsel. Meanwhile, the father also refused to cooperate with OCS's efforts to engage him in reunification services.

The superior court eventually terminated the father's parental rights. The father now appeals, arguing that the superior court deprived him of due process in its management of his representation issues, and that the court erred in determining that OCS had made reasonable efforts to reunite the family. We reject both arguments and affirm the superior court's termination order.

# II.    FACTS AND PROCEEDINGS

## A.    Children Taken Into OCS Custody

In January 2019, Phoebe G. filed for divorce from Roman G.[1] The couple had four children between the ages of one and four years old — Aidan, Stefan, Eli, and Yale. While their divorce proceedings were pending, Phoebe and Roman alternated custody. But after a custody exchange in July 2020, daycare workers discovered severe bruising on Yale's body. A forensic nurse concluded that the bruising was "highly suspicious for non-accidental trauma." Because Roman had just returned custody of the children to Phoebe and because Phoebe had limited time with the children before

---

[1]    We use pseudonyms to protect the family's privacy.

dropping them off at daycare, OCS staff concluded that the bruising found on Yale was caused by Roman.

OCS thereafter filed a non-emergency petition to adjudicate the children in need of aid. After an initial hearing, the superior court granted temporary custody of the children to OCS, which placed the children with Phoebe. Immediately after that hearing, Roman went to the Alaska State Troopers and falsely reported that Phoebe was withholding the children from him. He did not inform the troopers that OCS had just been granted custody. The troopers reached out to OCS, and OCS informed the troopers of the court's custody order. The troopers referred criminal charges to the district attorney's office for Roman's making a false report.

Following a contested hearing, the court found that there was probable cause that the children were in need of aid pursuant to AS 47.10.011(6) (physical harm) and (8) (mental harm). The court also separately granted OCS's request for a long-term domestic violence protective order that prevented Roman from unsupervised contact with Phoebe and the children.

B. OCS's Reunification Efforts

After assuming custody of the children, OCS went to great lengths to engage Roman in reunification services. An OCS caseworker met with Roman for two "five hour plus" case planning meetings within the first month after the children were taken into custody. The caseworker attempted to "build rapport" with Roman by maintaining "constant contact," which involved communicating almost daily by either text, phone call, email, or meeting in person. Despite this, Roman refused to discuss case planning with the caseworker.

In light of the evidence related to the physical abuse of Yale, as well as reports that Roman had a history of sexual assault and had repeatedly sexually assaulted Phoebe, the OCS caseworker also referred Roman for a psychological evaluation, but Roman refused to work with the doctor. He instead hired his own doctor to perform a

psychological evaluation, whom OCS was unable to communicate with or provide collateral information to because Roman did not sign a release of information.

Despite the limited reliability of the doctor's evaluation given OCS's inability to provide collateral information, OCS still incorporated the doctor's recommendations into its case plan. One of these recommendations was that Roman engage in individual counseling to address "the impact of his own sexual victimization" on the way he viewed women and personal boundaries in relationships. In light of that recommendation, OCS arranged to pay for counseling services with an experienced licensed psychologist who had expertise in working with individuals who had committed sex offenses. However, Roman refused to engage with the psychologist's services, and instead insisted on meeting with a counselor of his own choosing.

In addition to arranging counseling services for him, OCS arranged for Roman to work with an experienced parenting coach. Roman completed four sessions with the parenting coach, but he refused to complete releases of information that OCS requested, and the parenting coach refused to review collateral information regarding Roman prior to supervising visits, so OCS terminated those services. OCS also tried to arrange for another professional to provide therapeutic visitation services to Roman and the children. But after receiving an intimidating phone call from Roman on her private phone, that provider decided that she no longer wanted to be involved in Roman's case.

In addition to refusing to cooperate with OCS in reunification efforts, Roman displayed intimidating, threatening, and disturbing behavior towards OCS staff. When an OCS employee came to do a welfare check at Roman's home, he told her that "she was not free to leave" until he could verify her identity. At one point, Roman threatened to slit his caseworker's throat, and at another, he brought two fixed-blade hunting knives on his belt into the OCS visitation room.

## C. Roman's Issues With His Court Appointed Counsel

While Roman resisted OCS's reunification efforts, he also struggled with, and repeatedly complained about, his court-appointed attorney. From November 2020

to March 2022, Roman was afforded six representation hearings to discuss his dissatisfaction with his attorney's performance. Over the course of those hearings, it became apparent that Roman's frustration stemmed from his attorney's refusal to file frivolous motions regarding an Indonesian arbitration agreement that Roman incorrectly believed deprived Alaska courts of jurisdiction over the custody issues relating to the children. Roman further maintained that his attorney was "ineffective."

Over the course of the multiple representation hearings, the superior court repeatedly found that Roman's attorney was highly effective. However, after six hearings — and Roman's repeated assertion that his attorney was ineffective — the court ultimately released Roman's attorney due to the irreparable deterioration of the attorney-client relationship. At Roman's suggestion, the court appointed Roman's *Flores*[2] counsel in his divorce and custody case as his attorney in this matter.

### D. Termination Petition, Trial, And Order

After engaging Roman in the considerable reunification efforts described above, OCS petitioned to terminate Roman's parental rights.

After taking evidence and hearing argument over the course of a nine-day trial, the superior court terminated Roman's parental rights, finding by clear and convincing evidence that the children were in need of aid under AS 47.10.011(6) (physical harm), (7) (sexual abuse), and (8) (mental injury); that Roman had failed to remedy the conduct and conditions causing the children to be in need of aid; that OCS had made reasonable efforts to reunite the family; and that termination was in the children's best interests.

---

[2] *See Flores v. Flores*, 598 P.2d 893, 893-94 (Alaska 1979) (holding that due process required that "an indigent party [have] the right to court-appointed counsel in a private child custody proceeding in which [their] spouse is represented by Alaska Legal Services Corporation (ALSC)"). Here, Phoebe was represented by ALSC in the divorce and custody case. Therefore, under *Flores*, Roman was entitled to appointed counsel in the custody case as well as in the CINA case.

In examining OCS's efforts, the court questioned OCS's failure to provide collateral information to the doctor Roman had hired to perform a psychological evaluation. The court also found that OCS's discontinuation of the parenting coach's services was "unfortunate" because Roman appeared "to have had a positive working relationship" with the parenting coach. However, the court also found by clear and convincing evidence that OCS's extensive efforts over the life of the case were reasonable. The court recounted how Roman's caseworker had spent numerous, hours-long case planning sessions with Roman; how OCS had attempted to arrange and even pay for Roman's therapy sessions with a psychologist, as well as therapeutic visitation services; how OCS had incorporated into its case plan Roman's doctor's recommendations that he participate in individual counseling and parenting coaching; and how OCS had made monthly home visits to the children, set up therapeutic services for them, and provided vouchers for their maintenance while in OCS custody. The court also found that Roman had directed his energy "toward fighting [OCS's reunification] efforts" rather than cooperating with them. The court concluded that Roman had "made no progress to remedy the conditions that caused [the] children to be in need of aid" and terminated his parental rights.

Roman appeals, arguing that the superior court deprived him of due process in its handling of his representation issues and erred in determining that OCS made reasonable efforts to reunite the family.

## III. STANDARDS OF REVIEW

We review a parent's due process challenge in the context of a CINA case de novo, adopting "the rule of law most persuasive in light of precedent, reason, and policy."[3]

---

[3] *Paula E. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 276 P.3d 422, 430 (Alaska 2012) (quoting *D.M. v. State, Div. of Family & Youth Servs.*, 995 P.2d 205, 207 (Alaska 2000)).

" 'Whether OCS made reasonable efforts to reunify the family is a mixed question of law and fact.' For mixed questions, 'we review factual questions under the clearly erroneous standard and legal questions using our independent judgment.' "[4]

## IV. DISCUSSION

### A. The Court's Handling Of Roman's Representation Issues Did Not Deny Him Due Process.

Roman argues that he was deprived of due process by the superior court's handling of his representation issues and claims of ineffective assistance.[5] He maintains that the superior court gave him "the runaround" by "gaslighting" him through a series of hearings regarding those issues from November 2020 to March 2022. He further argues that "the superior court should have fairly and expeditiously disposed of his claims so that [he] could have focused his attention on the substantive CINA case instead of adjacent issues" and that the court's failure to do so denied him due process.

At its heart, due process guarantees a parent the "opportunity to be heard and the right to adequately represent one's interests."[6] We apply the factors from *Mathews v. Eldridge* when considering the argument that a parent was denied procedural due process in the context of a CINA case.[7] These factors direct us to

---

[4] *Kylie L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 407 P.3d 442, 448 (Alaska 2017) (quoting *Jay B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 382 P.3d 1154, 1162 (Alaska 2016)).

[5] *See Alex H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 389 P.3d 35, 48 (Alaska 2017) ("The right to the care and custody of one's own child is a fundamental right recognized by both the federal and state constitutions, and therefore falls within the protections of the due process clause." (internal quotation marks omitted) (quoting *Seth D. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 175 P.3d 1222, 1227-28 (Alaska 2008))).

[6] *D.M.*, 995 P.2d at 213-14 (quoting *Matanuska Maid, Inc. v. State*, 620 P.2d 182, 192 (Alaska 1980)).

[7] *Seth D.*, 175 P.3d at 1227 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

consider: (1) the private interest at stake, (2) the risk of an erroneous deprivation through the procedures used and the added value of additional procedural safeguards, and (3) the State's interest in affording additional process, which requires taking into account the fiscal and administrative costs involved.[8]

Roman accurately describes the private interest at stake here as the "fundamental right" to "the care and custody of one's own child."[9] But then Roman implausibly contends that he should have been afforded *less* process — that the court should have "expeditiously disposed" of his ineffective assistance of counsel claims, which he now characterizes as a distraction from the substance of the CINA matter.[10]

Roman cannot fault the superior court for any distraction that resulted from litigating his representation issues. Despite the court's repeated instruction on the point throughout the course of the representation proceedings, Roman persisted in his assertion that his attorney should file frivolous motions arguing that the court lacked jurisdiction. And in spite of multiple determinations by the court that Roman's appointed counsel was providing highly effective representation, without conflict, Roman persisted in seeking additional representation hearings.

Indeed, after the superior court had held two representation hearings at Roman's request, and both times maintained the appointment of his counsel, the court

---

[8]    *Mathews*, 424 U.S. at 335.

[9]    *Alex H.*, 389 P.3d at 48 (quoting *Seth D.*, 175 P.3d at 1227).

[10]    Roman also argues that the handling of his representation issues effectively denied him his right to counsel. We reject this argument. Roman had an attorney throughout the entire course of this case. He was never deprived of his right to counsel. We further note that Roman's argument relies on a dissenting opinion in a vastly dissimilar case involving the denial of an Indian custodian's right to counsel in a matter involving the Indian Child Welfare Act. *See Molly O. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 320 P.3d 303, 310-11 (Alaska 2014) (Bolger, J., dissenting) (disagreeing with majority's review of denial of Indian custodian's right to counsel for harmless error, and characterizing error as structural).

set a hearing before a magistrate judge to make further findings regarding his ineffective assistance of counsel claims and representation issues. In its order setting the hearing, the court reminded Roman that "his right to counsel does not entitle him to the counsel of his choice."[11] And it informed Roman that he would only be entitled to new counsel if his "attorney's performance was below a level that any reasonably competent attorney would provide, bearing in mind that 'reasonable tactical decisions are virtually immune from subsequent challenge even if, in hindsight, better approaches could have been taken.' "[12] Finally, the court reminded Roman that he had a right to represent himself so long as his request for self-representation was knowing and intelligent.[13]

After examining Roman, his appointed attorney, and a representative of the appointed agency, the magistrate found that Roman's attorney's performance was not "below a level that any reasonably competent attorney would provide," and in fact, that Roman's attorney had gone "above and beyond the call of duty" for Roman in the matter. The court noted that Roman's attorney had filed several substantive motions "asserting almost all of the positions" that Roman had wanted her to, "appeared to competently and zealously" advocate for Roman, "enlisted the help of an investigator" to examine whether the photos of the children used at the probable cause hearing "were altered," and had gone over discovery with Roman, hired a medical expert to testify at

---

[11] *Coleman v. State*, 621 P.2d 869, 878 (Alaska 1980) ("[I]ndigent defendants are not constitutionally entitled to counsel of their choice . . . .").

[12] *Chloe W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 336 P.3d 1258, 1265 (Alaska 2014) (quoting *Chloe O. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 309 P.3d 850, 858-59 (Alaska 2013)).

[13] *Massey v. State*, 435 P.3d 1007, 1010 (Alaska App. 2018) (stating defendant must "understand[] their right to counsel, the important advantages of having counsel, and the dangers and disadvantages of self-representation" and that court must ensure that defendant is "minimally capable" of defending in "rational and coherent manner." (first quoting *Shorthill v. State*, 354 P.3d 1093, 1109 (Alaska App. 2015); and then quoting *James v. State*, 730 P.2d 811, 813 (Alaska App. 1987))).

the probable cause hearing, and contested every finding in the case up to that point. The court found that Roman was "always going to have an issue with the performance of" his attorney "if the outcome of the proceedings" did not go his way.

Despite these findings that decisively rejected his claim that his attorney was ineffective, Roman persisted in espousing his unfounded belief that his attorney was "in love with OCS" and trying to sabotage his case. This resulted in two additional representation hearings before the superior court released the appointed agency from further representation of Roman in light of the conflict Roman had created.

In sum, the superior court made significant efforts to ensure that Roman's representation claims were fairly and thoroughly addressed. He cannot now argue he was prejudiced by the very process that ensured he received what he requested — effective representation. Roman's characterization of the court's careful consideration of his representation issues as "gaslighting" him and giving him "the runaround" is without merit.

B. **OCS Made Reasonable Efforts.**

Roman also argues that the superior court erred in determining that OCS made reasonable efforts to reunite him with the children. In particular, he focuses on two areas of difficulty the superior court found in OCS's efforts, and he contends that those difficulties prevent a finding that OCS's efforts overall were reasonable. We are not persuaded.

When OCS takes custody of a child, it is required to "make timely, reasonable efforts to provide family support services" with the aim of achieving reunification.[14] And before terminating parental rights, the superior court must find by

---

[14] See AS 47.10.086(a), requiring OCS to:

(1) identify family support services that will assist the parent or guardian in remedying the conduct or conditions in the home that made the child a child in need of aid;

clear and convincing evidence that OCS has satisfied its obligation to make reasonable efforts.[15]  While these efforts must be reasonable, they "need not be perfect."[16]  We have held that efforts should be assessed in "light of the circumstances of the case," which "include a parent's unwillingness to participate in treatment."[17]  And we consider "all interactions between the parent and OCS" and "the entire history of services" that OCS has provided.[18]

Roman latches onto the superior court's questioning of OCS's inability to provide collateral information to the doctor Roman had hired to perform a psychological evaluation, as well as the court's finding that OCS's termination of the parenting coach's services was "unfortunate," to argue that OCS's efforts as a whole were unreasonable.  Roman maintains that had his doctor been provided collateral information, he would have received "a more accurate and beneficial evaluation," which may have "better remedied his barriers to reunification."  And he contends that

---

(2) actively offer the parent or guardian, and refer the parent or guardian to, the services identified under (1) of this subsection; the department shall refer the parent or guardian to, and distribute to the parent or guardian information on, community-based family support services whenever community-based services are available and desired by the parent or guardian . . .; and

(3) document the department's actions that are taken under (1) and (2) of this subsection.

[15]  AS 47.10.088(a)(3).

[16]  *Annette H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 450 P.3d 259, 267 (Alaska 2019) (quoting *Violet C. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 436 P.3d 1032, 1038 (Alaska 2019)).

[17]  *Id.* at 268 (quoting *Amy M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 320 P.3d 253, 259 (Alaska 2013)).

[18]  *Id.* (quoting *Sylvia L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 343 P.3d 425, 432 n.21 (Alaska 2015)).

had the parenting coach continued her services, he could have "demonstrated new skills and abilities" that supported reunification. But Roman's arguments fail for several reasons.

First, Roman fails to consider the fact that OCS could not provide his doctor with collateral information because Roman would not sign a release that would have allowed OCS to speak with the doctor.

Second, there is no reason to believe that Roman would have engaged with his doctor's recommendations had they been better informed by collateral information. To the contrary, the record demonstrates that Roman refused to engage with his doctor's recommendation that he attend individual therapy with a counselor specializing in treating sex offenders.[19] Rather than meeting with an experienced psychologist OCS had identified who specialized in the area recommended by Roman's doctor, Roman insisted on meeting with a counselor not approved by OCS. There is nothing in the record to support an inference that Roman would have been more amenable to following his doctor's recommendations had the doctor been provided with more collateral information.

Third, Roman's argument fails to consider the fact that OCS engaged in extensive efforts that were specifically tailored to meet his needs, and that Roman rebuffed OCS's efforts at nearly every turn over the "entire history" of the case.[20] For example, less than two weeks after OCS assumed custody, Roman's caseworker met with Roman for an initial case planning meeting. The caseworker stayed at Roman's house that day for "five plus hours," and brought releases and other case planning documents in order to make service referrals. In spite of these efforts to engage him,

---

[19] *See id.* (providing courts can consider "a parent's unwillingness to participate in treatment" when considering reasonable efforts (quoting *Amy M.*, 320 P.3d at 259)).

[20] *Id.* (quoting *Sylvia L.*, 343 P.3d at 432 n.21).

Roman refused to engage in case planning at that time. Still, Roman's caseworker met again with him less than a month later for another "five plus hour" case planning session, and Roman again refused to cooperate, instead insisting that Phoebe had actually assaulted Yale and that he was the victim of a "set up."

Despite Roman's refusal to cooperate, his caseworker continued to attempt to "build rapport" with him by maintaining "constant contact" which involved communicating almost daily by text, phone call, email, or through in-person meetings. Roman's caseworker arranged multiple visitations to occur at public parks or other places in the community rather than at the OCS facility, per Roman's request. Still, Roman refused to cooperate with case planning, and at one pointed rebuffed his caseworker's efforts by threatening to "slit [his] throat."

Later, OCS hired a professional counselor to facilitate therapeutic visitation services with Roman and the children. However, before the counselor had her first session with Roman, she received a phone call from him on her personal phone in which he questioned her about her credentials and then attempted to tell her that OCS had unjustifiably removed the children from him. The counselor asked Roman how he had found her personal phone number, and he told her that he had hired a private investigator to find it because OCS would not give it to him. Concerned by Roman's lack of boundaries, she declined to be involved with Roman's case further.

The superior court's conclusion that OCS made reasonable efforts to reunite the family is well supported by the record. "OCS's duty to 'offer reunification services is fulfilled by setting out the types of services that a parent should avail himself or herself of in a manner that allows the parent to utilize the services.' "[21] Here, OCS went to great lengths to set out services for Roman that would support reunification, and to arrange for providers who were uniquely equipped to meet his needs. Despite

---

[21] *Id.* (quoting *Emma D. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 322 P.3d 842, 851 (Alaska 2014)).

OCS's extensive efforts, Roman systematically rebuffed them at every stage of the case. The superior court therefore did not err in concluding that OCS's efforts were reasonable.

## V.   CONCLUSION

We AFFIRM the superior court's order terminating Roman's parental rights.