*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| SYLVIA L., | ) | |
| | ) | Supreme Court No. S-15586 |
| Appellant, | ) | |
| | ) | Superior Court Nos. 3AN-12-00307/ |
| v. | ) | 3AN-13-00100/00229 CN |
| | ) | |
| STATE OF ALASKA, | ) | O P I N I O N |
| DEPARTMENT OF HEALTH AND | ) | |
| SOCIAL SERVICES, OFFICE OF | ) | No. 6984 - February 20, 2015 |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Patrick J. McKay, Judge.

Appearances: Gregory M. Heritage, Heritage Law Firm, LLC, Anchorage, for Appellant. Jennifer A. Currie, Senior Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

MAASSEN, Justice.

## I.      INTRODUCTION

A mother appeals the termination of her parental rights to three of her children. She contends that the trial court erred in (1) finding that the children were

children in need of aid because of the mother's mental illness, a statutory basis for termination not alleged in the petition; (2) finding that the Office of Children's Services (OCS) made the necessary efforts towards reunification; and (3) allowing two witnesses to testify as experts. We affirm the trial court's order. We hold that (1) the trial court's finding that the children were children in need of aid was supported by alternative grounds that are not challenged on appeal; (2) its finding that OCS made the required efforts to reunify the family was supported by the evidence; and (3) its acceptance of the challenged expert testimony was not an abuse of discretion.

## II.     FACTS AND PROCEEDINGS

### A.     The Family And OCS Involvement

Sylvia[1] has had five children, three of whom, Daniel, Laura, and Julie, are involved in this appeal. Julie, the youngest, is an "Indian child" as defined by the Indian Child Welfare Act of 1978 (ICWA).[2] Sylvia has a history of mental illness and drug abuse. OCS's first contact with her, in 2002, concerned a child not involved in this appeal; Sylvia was diagnosed at that time with dysthymia, major depressive disorder, and attention deficit hyperactivity disorder (ADHD).

Daniel, the oldest of the three children, was born positive for cannabis in 2008. For his first few years he lived with Sylvia in the home of her grandmother, where he was raised by various family members, including Sylvia herself. OCS's involvement

---

[1]     We use pseudonyms to protect the family's privacy.

[2]     *See* 25 U.S.C. § 1903(4) (2012). Julie's tribe is the Seldovia Village Tribe, which intervened and supported OCS's position as to Julie.

with Daniel was prompted by concerns that he was malnourished and that Sylvia could not properly care for him because of her mental health and substance abuse issues.[3]

In March 2009 Good Samaritan Counseling Center's medical director, Dr. Jan E. Kiele, assessed Sylvia and diagnosed her with depressive disorder not otherwise specified and ADHD. Dr. Kiele found that Sylvia's prognosis at the time was good if she followed through with medical treatment and individual psychotherapy.

When Laura was born a few months later, she tested positive for opiates. From birth Laura was raised by another family and knows Sylvia as her "auntie," not her biological mother.

In June 2010 Sylvia was assessed at Counseling Solutions of Alaska and diagnosed with anxiety, depression, and ADHD. She followed through with a part of the recommendations — medication management meetings — but not with the individual counseling. In 2011 and 2012 she had several drug-related arrests and probation violations.

Julie was born cocaine-positive in September 2012. OCS took custody of her shortly after her birth and placed her in foster care as soon as she was discharged from the hospital.

The primary case worker at OCS for Sylvia's family was Jessica Mulhern. She testified that when she and Sylvia met after Julie's birth, Sylvia had difficulty tracking a conversation, and Mulhern suspected she was under the influence of drugs, although Sylvia denied it. Mulhern testified that she was unable to develop an in-home safety plan for Sylvia because there were no identified participants for such a plan, but she did develop a family contact plan for supervised visitation at the home of Julie's foster family. She also offered Sylvia a bus pass, but Sylvia declined it and only visited

---

[3]     OCS eventually took custody of Daniel in March 2013.

Julie "maybe once or twice." Mulhern testified that she had "only very minimal contact" with Sylvia throughout the case.

Mulhern also made a number of referrals. One was to Dr. Cherry, a psychiatrist who does neuropsychological evaluations, but Sylvia never returned to OCS to sign the required referral form. Mulhern also referred Sylvia to parenting classes, which Sylvia did not complete, and to ongoing urinalysis (UA) tests; she explained to Sylvia that missed UA tests would be considered positive.

Sylvia did receive a psychiatric assessment at Good Samaritan Counseling Center in November 2012, after having missed several appointments. She was diagnosed with post-traumatic stress disorder, generalized anxiety disorder, and major depressive disorder. OCS also referred her to Akeela Assessment Center for an integrated substance abuse and mental health assessment, which was conducted by Dorothy Pickles in December 2012. Sylvia sporadically attended medication management meetings at Good Samaritan but was eventually discharged for non-attendance. OCS lost contact with her entirely sometime in March 2013. Mulhern testified at trial that she tried to reach Sylvia through her probation officer but Sylvia was listed as "abscond." In other attempts to find her, Mulhern made unannounced visits to Sylvia's family home, called her attorney, sent letters to her grandmother's address, left messages on her cell phone, checked with a previous counseling service, and made regular checks of a prison database. In the meantime, Mulhern arranged family contact for Daniel with his father and aunt, approving supervised visits at the foster home. She developed a written case plan and reviewed it with Daniel's father (though he refused to sign it). She made various referrals for Daniel's father, but with little success.

Around the same time, OCS representative Deb LeFebvre responded to calls about Laura's living situation, involving allegations of domestic abuse in the family

with which Laura was living. Unable to locate Sylvia, LeFebvre filed a child in need of aid petition for Laura, and OCS took custody of the child in June 2013.

In August 2013, OCS petitioned to terminate the parental rights of Sylvia to the three children — Daniel, Laura, and Julie — and the rights of the children's fathers.[4] The petition alleged that Sylvia was not in a position to parent her children because she had never engaged in her case plan in any real sense; had been out of contact with OCS since March 2013; struggled with ongoing substance abuse and mental health issues but was not addressing the issues through treatment; and lacked stable housing and employment. The petition sought an order based upon clear and convincing evidence that the children were children in need of aid because they had been subjected to conditions or conduct described in a number of subsections of AS 47.10.011: (1) (abandonment), (2) (incarceration), (3) (child left with a custodian unable to provide adequate care), (8) (parental conduct resulting in mental injury or risk of mental injury to the child), (9) (neglect), and (10) (substance abuse).

In February 2014 Sylvia was arrested and imprisoned for driving with a revoked license, and Mulhern visited her twice at the jail. At trial Mulhern testified that other than a single visit with Daniel a few weeks before, Sylvia had had no contact with any of her children since "well before" OCS lost contact with her in early 2013.

### B. The Termination Trial And The Trial Court's Decision

The termination trial was held in March 2014. Sylvia was still incarcerated at the time; Daniel had just moved into the potential adoptive home of his paternal aunt; Laura lived in a licensed foster home; and Julie remained with the foster family she had been a part of since shortly after her birth.

---

[4] At the time of trial, Daniel's father was on probation and living in Anchorage, Laura's father's whereabouts were unknown, and Julie's father was incarcerated in Anchorage. Only Daniel's father testified at the termination trial.

Julie's foster mother testified at trial. She testified that she was open to contact from Sylvia but had not heard from her in over six months. She testified that the other children in her home had bonded with Julie and that she hoped to adopt her.

OCS supervisor Jaime Muhr testified as an expert in child development, safety threats, and mental health. She testified that, based on her review of the exhibits and the testimony, she believed Sylvia had a serious substance abuse problem secondary to her significant, untreated mental health issues, and that if left untreated Sylvia would continue to lead a life that was chaotic and unsafe for her children. Muhr testified that Sylvia's mental illness would not resolve itself and that she needed professional assistance and a healthy support system to help with daily living. According to Muhr, Sylvia's substance abuse affected her parenting because she was preoccupied with her own need for drugs to the detriment of the needs of her children. Muhr concluded that the risk of harm Sylvia posed to Julie — both physical and emotional — was extremely high.

The trial court found Dorothy Pickles, the counselor who evaluated Sylvia at Akeela, to be qualified as an expert in substance abuse and mental health. Sylvia's attorney objected to Pickles's qualifications and also objected on grounds that OCS had not given notice that Pickles would testify as an expert. OCS conceded that its decision to present Pickles as an expert witness had been made at the last minute. The court recognized the potential for prejudice but stated that "[t]he remedy for this, of course, is not to exclude the testimony I've already heard, but . . . if you decide that . . . you wish to have an expert testify [in response], let me know and we'll resolve that." Sylvia's attorney proceeded to question Pickles about her assessment of Sylvia; he did not request a continuance or the opportunity to present expert testimony that would respond to Pickles's opinions.

Pickles testified that she conducted an integrated assessment of Sylvia's mental health and substance abuse issues in December 2012. It was Pickles's opinion that Sylvia was unlikely to curtail her substance abuse without professional intervention. She recommended that Sylvia participate in an outpatient treatment program until she could enter a residential program and that she engage in behavior therapy, develop a sober support system with sober leisure time activities, participate in random UA testing, and comply with all Department of Corrections and OCS requirements.

The trial court also heard testimony from police officers who had encountered Sylvia or the children's fathers, from Sylvia's probation officers, her grandmother, Daniel's father, and Sylvia herself. At the end of trial OCS asked the court to find by clear and convincing evidence that all three children had been subjected to conduct as described in AS 47.10.011 and were children in need of aid under subsections (1), (2), (3), (6), (8), (9), (10), and (11). Sylvia's counsel pointed out that the petition did not list subsection (6) (parent's conduct causes physical harm or risk of physical harm to the child) or subsection (11) (parent's mental illness) as grounds for termination; OCS's counsel responded that Sylvia had raised the issue of mental health throughout trial and that the court could read the petition liberally to allege mental illness as a separate ground for a Child In Need of Aid (CINA) finding.

The trial court found that all three children were children in need of aid under the statutory subsections (1) (abandonment), (10) (substance abuse), and (11) (parent's mental illness) and terminated Sylvia's parental rights. The court found that OCS had made reasonable efforts to reunify Sylvia with Daniel and Laura and active efforts to reunify Sylvia with Julie. Relying in part on expert testimony from Dr. Kiele, Muhr, and Pickles, the court found beyond a reasonable doubt that Sylvia's mental illness would likely not resolve without professional intervention, and that returning Julie to Sylvia's custody would likely cause Julie serious emotional or physical harm. The

court found that terminating Sylvia's parental rights to all the children was in their best interests because they were doing well in foster care and could achieve permanency once they were freed for adoption. Sylvia appeals.

## III. STANDARDS OF REVIEW

In a CINA case, "we review the trial court's factual findings for clear error and its legal determinations de novo."[5] We review for abuse of discretion the trial court's determination that a witness may testify as an expert.[6] The trial court has abused its discretion when "the reasons for the exercise of discretion are clearly untenable and unreasonable."[7]

## IV. DISCUSSION

Before terminating parental rights under ICWA and the CINA statutes and rules, a trial court must find by clear and convincing evidence that the child is in need of aid because the child has been subjected to conduct or conditions described in AS 47.10.011;[8] that the parent has not timely remedied the conduct or conditions that place the child at substantial risk of harm;[9] and that OCS has made reasonable efforts towards reunification or, in the case of an Indian child, active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian

---

[5] *Emma D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 322 P.3d 842, 849 (Alaska 2014) (quoting *Chloe O. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 309 P.3d 850, 855 (Alaska 2013)) (internal quotation marks omitted).

[6] *L.G. v. State, Dep't of Health & Soc. Servs.*, 14 P.3d 946, 950 (Alaska 2000) (citing *Jordan v. Jordan*, 983 P.2d 1258, 1261 n.5 (Alaska 1999)).

[7] *Id.* (citing *Bailey v. Lenord*, 625 P.2d 849, 854 (Alaska 1981)).

[8] AS 47.10.088(a)(1); CINA Rule 18(c)(1)(A).

[9] AS 47.10.088(a)(2)(A); CINA Rule 18(c)(1)(A)(i).

family.[10] ICWA also requires that the court find, "by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child."[11] Finally, in both ICWA and non-ICWA cases, the trial court must determine by a preponderance of the evidence that "termination of parental rights is in the best interests of the child."[12]

>       A.      **Any Error In Allowing OCS's Tardy Amendment Of Its Petition Is Harmless In The Absence Of A Challenge To The Court's Alternative Grounds For A CINA Finding.**

The trial court found that Daniel, Laura, and Julie were children in need of aid under AS 47.10.011(1) (abandonment), (10) (substance abuse), and (11) (parent's mental illness). Sylvia argues that she was prejudiced when OCS added two grounds for termination to the petition following the close of evidence, one of which — mental illness — the court relied on. Sylvia contends that she had no opportunity to seek discovery related to these allegations, to cross-examine witnesses about them, or to prepare an appropriate argument.[13] But Sylvia does not challenge the trial court's findings that the children were in need of aid under subsections (1) and (10), which the

---

[10]     25 U.S.C. § 1912(d) (2012); AS 47.10.086(a); CINA Rule 18(c)(2).

[11]     25 U.S.C. § 1912(f); CINA Rule 18(c)(4).

[12]     CINA Rule 18(c)(3); *see also* AS 47.10.088(c) (requiring consideration of child's best interests).

[13]     Sylvia asserts that she would have pursued a different trial strategy had she known that OCS intended to assert mental illness as a basis for termination, but she gives no specifics. In fact, Sylvia's mental illness was a significant issue at trial, and her need for well-directed treatment of it is the focus of her "active efforts" argument on this appeal, as addressed later in this opinion.

petition did allege.[14] Although the tardy amendment certainly had the potential to prejudice Sylvia's case, under these circumstances any error in allowing it was harmless.[15]

**B.      The Trial Court Did Not Err When It Found That OCS Made Reasonable Efforts To Reunify Sylvia With Daniel And Laura And Active Efforts To Prevent The Breakup Of Julie's Indian Family.**

Sylvia argues that OCS failed to make reasonable efforts to reunify her with Daniel and Laura or — for ICWA purposes — active efforts to prevent the breakup of Julie's Indian family. Sylvia claims that OCS failed to develop a case plan or provide resources to effectively address her diagnosed mental illness and that beyond the initial assessment there was neither a plan nor resources to assist her with getting treatment. She maintains that it was only through her own efforts that she received any mental health care at all but that her illness limited her ability to determine precisely what help she needed or how to obtain it.

Before terminating parental rights to a non-Indian child, the trial court must find by clear and convincing evidence that OCS made timely, reasonable efforts to provide family support services designed to prevent out-of-home placement or enable

---

[14]      *See, e.g.*, *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 431 (Alaska 2012) ("Because we affirm the superior court's finding of abandonment, we do not reach the State's alternative argument for termination based on neglect.").

[15]      *See Alderman v. Iditarod Props., Inc.*, 32 P.3d 373, 395-96 (Alaska 2001) (holding that the superior court abused its discretion in allowing an amendment alleging a new claim at the close of evidence, where the prejudice to the opposing parties due to their inability to present evidence on the claim outweighed the hardship to the amending party).

the child's safe return to the family home.[16] Whether OCS made these reasonable efforts is a mixed question of fact and law.[17] By statute, OCS's duties include the duty to: (1) identify family support services that will assist the parent in remedying her conduct; (2) actively offer those services to the parent and refer the parent to them; and (3) document the department's actions.[18] The requirement that OCS offer reunification services "is fulfilled by setting out the types of services that a parent should avail . . . herself of in a manner that allows the parent to utilize the services."[19] Reunification efforts need not be perfect; they need only be reasonable under the circumstances, depending on the parent's substance abuse history, willingness to participate in treatment,[20] the history of services provided by OCS,[21] and the parent's level of cooperation.[22] The reasonableness of OCS's efforts may also depend on the parent's

---

[16] AS 47.10.086(a); AS 47.10.088(a)(3).

[17] *Emma D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 322 P.3d 842, 849 (Alaska 2014).

[18] AS 47.10.086(a).

[19] *Audrey H. v. State, Office of Children's Servs.*, 188 P.3d 668, 679 (Alaska 2008) (quoting *Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 77 P.3d 715, 720 (Alaska 2003)) (internal quotation marks omitted).

[20] *Amy M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 320 P.3d 253, 259 (Alaska 2013).

[21] *Audrey H.*, 188 P.3d at 679 n.35 ("[T]he determination of whether OCS made reasonable efforts may involve consideration of all interactions between the parent and OCS."); *Erica A. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 66 P.3d 1, 7 (Alaska 2003) ("[T]he reasonableness of the division's efforts . . . must be viewed in light of the entire history of services.").

[22] *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's*
(continued...)

expressed interest in parenting, with OCS's responsibility lessening as the parent's interest wanes.[23]

Before terminating parental rights to an Indian child, the trial court must find by clear and convincing evidence that OCS made active, but unsuccessful, efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family.[24] "OCS makes active efforts to reunite a family when it helps the parents develop the resources necessary to satisfy their case plans, but its efforts are passive when it requires the parents to perform these tasks on their own."[25] In determining whether OCS made active efforts, the trial court may consider all services provided during the family's involvement with OCS; it need not focus on a distinct period of time.[26] Also, the trial court may properly consider all of OCS's efforts from the time it first became involved with the family until the termination trial.[27] "[A] parent's demonstrated lack of willingness to participate in treatment may be considered

---

[22](...continued)
*Servs.*, 310 P.3d 943, 953 (Alaska 2013).

[23]     *Audrey H.*, 188 P.3d at 679.

[24]     25 U.S.C. § 1912(d) (2012); CINA Rule 18(c)(2); *see also Christopher C. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 303 P.3d 465, 476 (Alaska 2013).

[25]     *Sandy B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 216 P.3d 1180, 1188 (Alaska 2009).

[26]     *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1268-69 (Alaska 2008).

[27]     *Sandy B.*, 216 P.3d at 1189.

in determining whether the state has taken active efforts."[28]  Failed attempts to contact the parent or obtain information from her may qualify as active efforts if the parent's evasive or combative conduct "rendered provision of services practically impossible."[29] And "[i]f a parent has a long history of refusing treatment and continues to refuse treatment, OCS is not required to keep up its active efforts once it is clear that these efforts would be futile."[30]

In this case, the trial court stated in its oral findings that OCS made active efforts as to Julie and reasonable efforts as to all the children by referring Sylvia to substance abuse assessments, mental health counseling, parenting classes, and domestic violence counseling; and by providing transportation assistance, arranging family visits, requesting random UA testing, developing case plans, and attempting to locate Sylvia once OCS lost contact.  The trial court added more history in its written findings:  (1) after taking custody of Sylvia's first child in 2002, OCS referred her to parenting classes at the Alaska Women's Resource Center and to a psychological evaluation; (2) in 2008 OCS referred her to UA testing to demonstrate her sobriety; (3) in 2009 OCS referred her to a psychological assessment, arranged a substance abuse assessment, offered her transportation for getting to and from these services, referred her to mental health

---

[28]    *E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 991 (Alaska 2002) (quoting *N.A. v. State, Div. Of Family & Youth Servs.*, 19 P.3d 597, 603 (Alaska 2001)) (internal quotation marks omitted).

[29]    *Id.* at 990.

[30]    *Wilson W. v. State, Office of Children's Servs.*, 185 P.3d 94, 101 (Alaska 2008); *see also Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1021 (Alaska 2009) ("Where services have been provided and a parent has demonstrated a lack of willingness to participate or take any steps to improve, this court has excused minor failures by the state and rejected arguments that the state could possibly have done more.").

counseling, set up case plan meetings, referred her to random UA testing, referred her to domestic violence counseling services, and arranged for family contact; and (4) when Sylvia fell out of touch with OCS, her caseworker made numerous and varied attempts to find her. Having finally located Sylvia, her caseworker discussed the case plan with her and arranged for visitation with all three children.

We observe that there is little evidence of OCS efforts in late 2012 to help Sylvia follow through with the specific treatment options that Pickles recommended. But Sylvia disappeared just a few months after Pickles's assessment and could not be located until she was arrested in late 2013. And OCS provided ample evidence that its social workers had attempted for many years to help Sylvia develop the necessary skills to parent her children and get treatment for her mental health and substance abuse issues, and that her recovery was stymied by her own evasiveness and apparent lack of interest. In the context of OCS's history with Sylvia, we must affirm the trial court's finding that OCS made the required efforts to reunify the children with their mother and to prevent the breakup of the Indian family.

## C. The Trial Court Did Not Abuse Its Discretion When It Allowed OCS's Witnesses To Testify As Experts.

Before terminating parental rights to an Indian child, the trial court must find "by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child."[31] Support for this finding may come from the testimony of one or more expert witnesses or from aggregating the testimony of lay and expert witnesses.[32]

---

[31]  25 U.S.C. § 1912(f) (2012); CINA Rule 18(c)(4).

[32]  *L.G. v. State, Dep't of Health & Soc. Servs.*, 14 P.3d 946, 950 (Alaska (continued...)

Sylvia argues first that the trial court erred in allowing OCS to call Dorothy Pickles as an expert witness when it had failed to identify her as an expert before trial. Sylvia asserts that she suffered prejudice; she contends that had she known Pickles would be testifying as an expert, she would have requested additional discovery about her qualifications, been able to mount a more effective cross-examination, and may have obtained her own expert to assist in her preparation.

OCS did identify Pickles as a trial witness, just not as an expert. CINA Rule 8(d)(2) provides that for an expert like Pickles who "has had involvement with the family and" who "has not been retained solely for the purpose of providing an expert opinion," the party who intends to call her must disclose her identity and "provide any existing reports or written statements of these experts." OCS asserts that it did provide Sylvia with Pickles's existing reports and that Sylvia suffered no prejudice from the lack of a formal expert designation. Regardless of whether OCS's expert notice was deficient, we see no abuse of discretion in the trial court's resolution of the issue.[33] Sylvia had the opportunity to challenge Pickles's qualifications and did so extensively on cross-examination; more importantly, Sylvia did not take up the trial court's suggestion that she request a rebuttal expert if she thought she needed one.

Sylvia also argues that the opinion of another ICWA-qualified expert — OCS's own employee, Muhr — was necessarily biased because of her employment.

---

[32] (...continued)
2000).

[33]    *See D.M. v. State, Div. of Family & Youth Servs.*, 995 P.2d 205, 210-12 (Alaska 2000) (noting that although the court did not condone the timing of the State's actions, there was no due process violation where the parent failed to show prejudice from the State's failure to give notice that it would request that CINA findings be made under a clear and convincing standard rather than a preponderance of the evidence standard).

Sylvia asserts that in light of the significance of a parent's rights and the nature of OCS's role, expert testimony by OCS employees should be viewed with skepticism, and OCS should bear some burden to demonstrate that its employee has formed an expert opinion independent of the position of the agency. Sylvia emphasizes that Muhr's testimony was based primarily on her review of the files and other information OCS provided her for litigation purposes, and that she never personally met or interviewed Sylvia or the children.

But regardless of where Muhr got her information, her testimony was "sufficiently grounded in the facts and issues of the case" to be admissible.[34] Her testimony, based on OCS's records, took into account Sylvia's history of trauma as a child and an adult, her substance abuse, her underlying untreated mental health issues, the likelihood that her mental health issues would not resolve without professional intervention, the number of years she had been dealing with substance abuse, and the length of time Julie had been in OCS custody. Nothing precludes the trial court from accepting such testimony from an OCS employee, so long as a sufficient foundation has been laid regarding the expert's education, experience, employment history, and training.[35] As for Sylvia's fundamental claim that an OCS employee cannot testify

---

[34] *See Marcia V. v. State, Office of Children's Servs.*, 201 P.3d 496, 507 (Alaska 2009) (quoting *J.A. v. State, Div. of Family & Youth Servs.*, 50 P.3d 395, 400 (Alaska 2002)) (internal quotation marks omitted) (holding that the trial court may rely on the testimony of an expert, even if the expert did not interview the mother, daughter, or non-OCS service providers).

[35] *See id.* at 504-05; *In re Candace A.*, 332 P.3d 578, 585-86 (Alaska 2014) (reversing superior court decision that OCS supervisor did not qualify as an ICWA expert); *David S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 270 P.3d 767, 782 n.48 (Alaska 2012) (noting in dictum that "it seems most unlikely that [an OCS supervisor] would not qualify" as an expert "given [her] high degree of

(continued...)

without bias, it is well settled that an allegation of bias goes to testimony's weight, not its admissibility.[36] Sylvia's arguments must therefore be rejected.

## V.	CONCLUSION

For the reasons set forth above, we AFFIRM the decision of the trial court.

---

[35](...continued)
experience and previous qualification as an expert"); *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1119 (Alaska 2010) (upholding termination based in part on OCS supervisor's testimony as ICWA expert).

[36]	*DiCarlo v. Keller Ladders, Inc.*, 211 F.3d 465, 468 (8th Cir. 2000) (quoting 4 WEINSTEIN'S FEDERAL EVIDENCE § 702.06[8] at 702-59 (Joseph M. McLaughlin ed., 2d ed. 2000) for the proposition that "[a]n expert witness's bias goes to the weight, not the admissibility of the testimony, and should be brought out on cross-examination"); *see also Mitchell v. State*, 813 N.E.2d 422, 431 (Ind. App. 2004) ("Rule 702(a) does not require that the [expert] witness be unbiased."); *Khan v. State Dep't of Health*, 794 N.Y.S.2d 145, 147 (App. Div. 2005) ("The expert's alleged bias goes to the weight of his testimony, not its admissibility.").