NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

KATE W.,                                    )
                                            )       Supreme Court No. S-15988
                    Appellant,              )
                                            )       Superior Court No. 3AN-12-00418 CN
        v.                                  )
                                            )       MEMORANDUM OPINION
STATE OF ALASKA,                            )         AND JUDGMENT*
DEPARTMENT OF HEALTH &                      )
SOCIAL SERVICES, OFFICE OF                  )       No. 1582 - May 4, 2016
CHILDREN'S SERVICES,                        )
                                            )
                    Appellee.               )
                                            )
_____        )

        Appeal from the Superior Court of the State of Alaska, Third
        Judicial District, Anchorage, Patrick J. McKay, Judge.

        Appearances: Laurence Blakely, Assistant Public Defender,
        and Quinlan Steiner, Public Defender, Anchorage, for
        Appellant. Margaret Paton Walsh, Assistant Attorney
        General, Anchorage, and Craig W. Richards, Attorney
        General, Juneau, for Appellee. J. Adam Bartlett, Anchorage,
        Guardian Ad Litem.

        Before: Stowers, Chief Justice, Fabe, Winfree, Maassen, and
        Bolger, Justices.

_____

*       Entered under Alaska Appellate Rule 214.

# I.    INTRODUCTION

Following a trial, the superior court found that the Office of Children's Services (OCS) had failed to make reasonable efforts to reunify a mother with her young son because it had not offered her the mental health services she needed. Less than five months later, after taking more evidence, the court found that OCS's renewed efforts were reasonable, noting that the agency had arranged a mental health assessment for the mother but she had failed to follow up on its recommendations. Because the superior court's finding of reasonable efforts is not clearly erroneous, we affirm its decision to terminate the mother's parental rights.

# II.    FACTS AND PROCEEDINGS

## A.    Background

Kam W. was born in March 2011, the son of Kate W. and Wilbur J.[1] Kate has another daughter, Lydia. OCS entered Kate's life in 2010, when her substance abuse problems "inhibited her ability to safely parent [Lydia]" and she was incarcerated for probation violations. The OCS caseworker assigned to Lydia's case, Toi Registe, met with Kate monthly beginning in July 2010.

In November 2010, after completing a substance abuse assessment, Kate was released from prison and placed by the Department of Corrections in Akeela's Stepping Stones program for rehabilitation. She was pregnant with Kam at the time. As part of the program, Kate participated in a mental health assessment; her diagnoses mostly related to her substance abuse but also included antisocial personality disorder. The assessment recommended, among other things, that Kate pursue dialectical behavior therapy "to more effectively regulate her emotion, increase her ability to deal with

---

[1]    We use pseudonyms to protect the parties' privacy.

stress[,] and . . . learn interpersonal effectiveness skills." But when Stepping Stones learned that Kate had facilitated sales of heroin to other participants, she was removed from the program and transferred to Akeela's substance abuse recovery center.

In March 2011 Kate gave birth to Kam and moved to Dena A Coy's residential treatment program. At this time, according to Registe, Kate was sober, following her case plan for Lydia, and taking parenting classes. OCS provided Kate with bus passes, helped her look for housing, and referred her for urinalyses (UAs). But after Kate left Dena A Coy she failed to complete the aftercare portion of the program and stopped attending UAs.

By January 2012 Kate had resumed using methamphetamine, "her drug of choice," and was arrested for violating her probation. Her probation officer referred her for another substance abuse assessment, which recommended outpatient treatment. But a court revoked Kate's probation in April and imposed most of her suspended sentence. Kam was reportedly abused by several care givers while Kate was in prison, leading OCS to petition for emergency custody and place him with a foster parent. OCS arranged for Kate to have telephonic contact with Kam from prison.

## B. OCS's Efforts After Taking Custody of Kam

In December 2012 OCS assigned Registe to Kam's case because of her prior involvement with the family. Registe referred Kate to a substance abuse program at the prison, and Kate completed it. In February 2013 OCS established a new case plan which anticipated assisting Kate in obtaining another substance abuse assessment "to determine the level of substance abuse treatment needed." Kate participated in the assessment following her release from prison that same month and, following the assessment's recommendation, began outpatient treatment at a private treatment center.

Kate did not complete the outpatient treatment, and her contact with OCS soon ended. She failed to report to her probation officer in late March, again violating her probation conditions and leading to her arrest in May. OCS arranged for in-person visitation at the prison, and Registe reminded Kate to pursue the services that were available to her.

When Kate was released from prison, she again violated her parole. She escaped from a halfway house, stopped attending treatment, and cancelled her visits with Kam. She eventually turned herself in and was sent back to prison. In May 2014 OCS reestablished visitation, and a new OCS caseworker, Yvonne Denmon, met with Kate to discuss her case plan. According to Denmon, they discussed OCS's expectation that Kate have another substance abuse assessment, attend UAs, stay in contact with OCS, "maintain a clean and sober lifestyle, free from crime, and be consistent in [Kam's] life." But Denmon also explained that OCS's plan for permanency had shifted to terminating Kate's parental rights.

After Kate's release from prison in June 2014, Denmon again contacted her to discuss the services OCS could provide. Kate did not show up for their scheduled meeting, and OCS filed a petition that day to terminate Kate's parental rights to Kam.

In August Kate tested positive for methamphetamine and marijuana. Denmon called her to discuss the positive test, and Kate agreed to three UAs weekly. But she usually failed to show up for the scheduled UAs, and when she did she tested positive. Denmon stopped the UAs in late November because of all the missed appointments.

OCS approved the request of a paternal aunt in Idaho to adopt Kam.

## C.    The January Termination Trial

The superior court held a single-day termination trial in January 2015. Kate did not attend.  OCS presented six witnesses:  four OCS caseworkers and two foster parents.  Registe testified that Kate made minimal progress during Lydia's and Kam's cases.  She described Kate's sporadic involvement with OCS, her lack of follow-through on her case plan, and her cycle of substance abuse, incarceration, treatment, and re-engagement.  On cross-examination Registe agreed that Kate may have used illegal drugs as a form of self-medication because of her underlying mental health problems.  She also agreed with the conclusion of one of Kate's treatment providers that Kate could benefit from a mental health status exam.  But Registe also testified that it was difficult to make progress with Kate's mental health because she never stayed in treatment or in contact long enough to move past her substance abuse issues.  Registe noted that while Kate was at Dena A Coy the facility addressed many aspects of Kate's life:  she had a counselor, received individual therapy, and was treated for her mental health as well as her substance abuse problems.  According to Registe, Kate had mental health treatment available at Akeela too, and she was offered a referral to a program at the Alaska Women's Resource Center that included mental health treatment but declined the referral.  Registe testified that Kate would have had access to the mental health services she needed if only she had remained in any of the substance abuse treatment programs or followed through with OCS's referrals.

In closing argument, Kate's attorney noted that her client had been diagnosed with oppositional defiant disorder as early as 2004 and that her substance abuse had been identified as a form of self-medication caused by her mental health issues.  She argued that OCS had notice of this and should have obtained another mental health evaluation to help guide its treatment decisions.  When the court asked how long

Kate should be given to "engage in the [mental health] assessment," Kate's attorney said she expected that "as soon as an assessment could be set up, [Kate] would go."

The superior court found that OCS had proven all facts necessary for a termination of Kate's parental rights except for reasonable efforts to reunify the family. The court described OCS's efforts in most areas as satisfactory or "more than satisfactory." But the court found that a mental health assessment should have been part of Kate's case plan, to help OCS better understand the effect her mental health problems may have had on her substance abuse. The court denied the termination petition without prejudice and said it would "schedule a continued termination trial after the state has offered [the] mother services, including a mental health assessment, and made available mental health treatment, if recommended." Recognizing Kam's need for permanency, the court urged Kate to "expeditiously engage in the appropriate services, which should include both mental health and of course continuing substance abuse [services], or the Court will not and cannot find any lengthy delay to be reasonable."

**D.    OCS's Renewed Efforts And The May Termination Trial**

The termination trial continued on May 28, 2015. Denmon testified that after the January trial she had Kate sign releases of information for mental health evaluations. She then made an appointment for Kate to see Dr. Michael Rose the following week. She left phone messages for Kate at two different numbers and informed both Kate's father and her attorney of the scheduled appointment and of OCS's willingness to pay for a cab if needed, but Kate missed the appointment. OCS was unable to schedule another assessment until March. Kate was allowed telephonic visitation with Kam during this time, but she never called.

Dr. Rose testified that he evaluated Kate on March 9, 2015, and diagnosed her with substance dependence and borderline personality disorder. He explained that

Kate likely posed a risk to Kam because borderline personality disorder makes parenting difficult due to unstable emotions and "erratic and unpredictable moods." It was Dr. Rose's recommendation that Kate pursue mental health treatment and dialectical behavior therapy, but that she needed to first address her substance abuse if those therapies were to be effective. He testified that even if Kate could maintain sobriety, it would still take several months to a year to see the necessary improvement in her mental health.

OCS caseworker Michelle Virden testified that she had just been assigned Kam's case in February. Like her predecessors, Virden had trouble getting in touch with Kate. To promote predictability she established a standing weekly appointment, but Kate attended only the first, on April 23, and missed the others. At the one meeting Kate attended, Virden gave her Dr. Rose's assessment and treatment recommendations. She encouraged Kate to pursue as many services as possible before the termination trial continued, including mental health treatment and UAs, to demonstrate her interest in parenting. Virden also offered Kate an appointment for substance abuse treatment and dialectical behavior therapy. Although Kate agreed to UAs, she failed to appear for a single one, and she once again lost contact with OCS. Virden admitted that she told Kate she was unsure what was likely to happen when the termination trial continued. But she testified that she urged Kate to be engaged as much as possible before the trial: "[Y]ou want to put whatever effort you can . . . to show what you're willing and able to do to stop this process from going [on]."

Kate testified as well. She said she stopped showing up after her single meeting with Virden "because it was discouraging." She said that Virden told her "there was really nothing that could change so late in this case" and that she was not willing to

make an effort if nothing would change. She also asked the court for another psychological evaluation because she did not agree with Dr. Rose's conclusions.

After hearing the testimony, the superior court found that Kate had failed to take advantage of her "one last chance." Finding that OCS had now made reasonable efforts, it terminated Kate's parental rights to Kam.

## III. STANDARD OF REVIEW

"In a CINA case, 'we review the trial court's factual findings for clear error and its legal determinations de novo.' "[2] "Whether OCS made . . . reasonable efforts is a mixed question of fact and law."[3]

## IV. DISCUSSION

### A. Legal Framework

Alaska Statute 47.10.088(a)(3) provides that before terminating parental rights, a superior court must find that OCS "has complied with the provisions of AS 47.10.086 concerning reasonable efforts." To satisfy its reasonable-efforts duty OCS must "identify family support services that will assist the parent . . . in remedying the conduct or conditions in the home that made the child a child in need of aid"; "actively offer" those services to the parent; and document the actions it takes to satisfy the statutory directive.[4] We have explained that "[r]eunification efforts need not be perfect; they need only be reasonable under the circumstances, depending on the parent's substance abuse history, willingness to participate in treatment, the history of services

---

[2]     *Sylvia L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 343 P.3d 425, 430 (Alaska 2015) (quoting *Emma D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 322 P.3d 842, 849 (Alaska 2014)).

[3]     *Id.* at 432.

[4]     AS 47.10.086(a)(1)-(3).

provided by OCS, and the parent's level of cooperation."[5]  "The reasonableness of OCS's efforts may also depend on the parent's expressed interest in parenting, with OCS's responsibility lessening as the parent's interest wanes."[6] We have also recognized that  OCS's "efforts must be evaluated in light of the circumstances of each particular case,"[7] including "the entire history of services that the [S]tate had already provided."[8]

**B.  The Superior Court Did Not Err In Finding That OCS Made Reasonable Efforts.**

Kate disputes that OCS's efforts were reasonable, arguing that OCS's efforts to address her mental health between January and May 2015 were "untimely and insufficient" and that all its efforts up to that time were not really designed to reunify her with Kam.

**1.  The record supports a finding that OCS's efforts to address Kate's mental health issues were reasonable in light of the entire history of OCS's efforts.**

Kate argues that she was not given enough time after the January termination trial to pursue mental health treatment and that OCS gave her too little help. She argues that discouraging remarks from both Virden and Dr. Rose, particularly given her "oppositional defiant disorder diagnosis" and other mental health issues, made it "foreseeable that [she] would be unsuccessful without more effort from OCS and without more time to remedy her mental health issues."  But Kate's long history with OCS

---

[5]     *Sylvia L.*, 343 P.3d at 432 (citations omitted).

[6]     *Id.*

[7]     *Audrey H. v. State, Office of Children's Servs.*, 188 P.3d 668, 678 (Alaska 2008).

[8]     *Erica A. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 66 P.3d 1, 7 (Alaska 2003).

supports a conclusion that her involvement would likely have been minimal regardless of what she was told by Virden and Dr. Rose at this late date about her prospects for success. And to the extent there was a conflict between Kate's testimony — that Virden was so discouraging she gave up trying — and Virden's testimony — that she encouraged Kate to do whatever she could to prove to the court her commitment to parenting — that conflict was for the superior court to resolve.[9]

Furthermore, a comparison of Kate's and OCS's efforts during the period between trial dates is telling. Immediately after the January trial Kate missed a scheduled goodbye visit with Kam; Denmon, the OCS caseworker, still ensured that Kate would see her son before he left for his new placement with his aunt in Idaho. Denmon used that meeting to also get signed releases from Kate for her mental health records, so OCS could set up an appointment for the mental health evaluation. Denmon then contacted providers, scheduled an evaluation for the next week, and tried in a variety of ways to relay this information to Kate. When Kate failed to make it to the evaluation, Denmon scheduled another for the earliest possible date.

The case was soon transferred to Virden, who made many attempts to stay in contact with Kate. Though Kate's telephone numbers changed, Virden successfully scheduled one meeting, and when Kate appeared on the wrong day Virden set up a standing weekly appointment. At the one appointment Kate attended, Virden encouraged her to pursue as many services as possible, offered mental health and

---

[9] *See Trevor M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, ___ P.3d ___, Op. No. 7086 at 11 n.19, 2016 WL 933415, at *5 n.19 (Alaska Mar. 11, 2016) ("We defer to the trial court's resolution of conflicts in testimony." (citing *Emma D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 322 P.3d 842, 849 (Alaska 2014))).

substance abuse treatment consistent with Dr. Rose's recommendations, and scheduled regular UAs.

Kate participated in almost none of these offered services, attending only the second scheduled evaluation with Dr. Rose and the first scheduled meeting with Virden. She did not follow Dr. Rose's or Virden's recommendations. She was aware of the scheduled UAs but did not attend any. She admitted that she continued to use marijuana and drink alcohol "occasionally." She did not call Kam, even though a liberal plan for phone visitation was in place.

In sum, although the time between the two termination trials was short, OCS used the time to make further efforts, while Kate remained unengaged. And viewing the entirety of OCS's involvement, as we must,[10] the agency's efforts appear extensive. Before the first termination trial Kate received a variety of services, through both OCS and the Department of Corrections,[11] that included rehabilitation, assessing her mental health needs, and parenting. OCS caseworkers provided substance abuse referrals, bus passes, housing assistance, and UA referrals; created case plans; and discussed those plans with Kate. The caseworkers explained OCS's expectations and the efforts necessary to keep or (later) to reunify with Kam. Kate received at least two substance abuse assessments and substance abuse treatment; and OCS facilitated

---

[10]     *See Erica A.*, 66 P.3d at 7-8 (stating that "the reasonableness of the division's efforts in 1999 and 2000 must be viewed in light of the entire history of services that the state had already provided").

[11]     OCS's reasonable efforts may include services provided by other entities, including the Department of Corrections. *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1262 n.48 (Alaska 2010); *see also Denny M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 365 P.3d 345, 350 (Alaska 2016) (holding that OCS is also entitled to rely on services provided through "the specialized therapeutic courts of the Alaska Court System — wellness courts, mental health courts, and veterans courts").

telephonic and in-person visitation while Kate was incarcerated and both supervised and unsupervised visitation while she was free.

The record supports a conclusion that the greatest obstacle to Kate's success was her failure to take advantage of what she was offered. The superior court did not clearly err in finding that OCS made reasonable efforts to provide Kate with necessary services.

> **2. The record supports a finding that OCS's earlier efforts were designed towards reunification.**

The secondary focus of Kate's appeal is the entirety of her involvement with OCS leading up to the January 2015 trial. She argues that OCS should have worked harder at reunification because she successfully parented Kam when he was an infant, she had a strong desire to be a good parent, and she actively pursued visitation. She faults OCS for failing to keep her informed of the status of Kam's care and failing to involve her in important decisions, including the decision to place Kam in a foster home. She identifies what she perceives to be inadequacies in OCS's case plans.

We have carefully reviewed the record of OCS's efforts from the time of its first involvement with Kate in 2010 through the date of termination. OCS's efforts were often focused on her substance abuse, but her repeated incarcerations and relapses, triggering further separations from Kam, made her substance abuse an obvious priority. Taking into account all the relevant circumstances, including Kate's "substance abuse history, willingness to participate in treatment, the history of services provided by OCS, and the parent's level of cooperation,"[12] we see no clear error in the superior court's finding that OCS's efforts, though ultimately unsuccessful, were designed to facilitate Kam's return to his mother's care.

---

[12] *Sylvia L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 343 P.3d 425, 432 (Alaska 2015) (citations omitted).

## V. CONCLUSION

Because the superior court did not clearly err in finding that OCS made reasonable efforts to reunify Kate with her son, we AFFIRM the superior court's order terminating Kate's parental rights.