NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| JEROME S., | ) |
| | ) Supreme Court No. S-18084 |
| Appellant, | ) |
| | ) Superior Court No. 3AN-17-00175 CN |
| v. | ) |
| | ) MEMORANDUM OPINION |
| STATE OF ALASKA, DEPARTMENT | ) AND JUDGMENT* |
| OF HEALTH & SOCIAL SERVICES, | ) |
| OFFICE OF CHILDREN'S SERVICES, | ) No. 1886 – April 6, 2022 |
| | ) |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Thomas A. Matthews, Judge.

Appearances: George W.P. Madiera, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Appellant. Paul Peterson and Kimberly D. Rodgers, Assistant Attorneys General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellee.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

## I.    INTRODUCTION

The Office of Children's Services (OCS) took custody of a boy when he was almost two years old. His mother struggled with substance abuse, and his father was incarcerated for significant periods of time. OCS primarily directed its efforts toward the

---

\*      Entered under Alaska Appellate Rule 214.

mother and did not meaningfully involve the father in case planning or maintain contact with him.  After the mother died, OCS petitioned to terminate the father's parental rights.  The superior court granted OCS's petition and the father appeals, arguing that OCS failed to make active efforts to reunify him with his child and that termination was not in the child's best interests.  We agree that OCS failed to make active efforts to reunify the family, given the very meager efforts directed at the father throughout the duration of the case, and we therefore vacate the superior court's order terminating the father's parental rights.

## II.    FACTS AND PROCEEDINGS

Jerome S. and Madeline J.'s son Jordan was born in 2015.[1]  Jordan is an "Indian child"[2] as defined by the Indian Child Welfare Act (ICWA).[3]  OCS took custody of Jordan in March 2017 after learning that Madeline could not safely care for him; OCS was unable to locate Jerome at the time.  By the time of the emergency probable cause hearing three days later, OCS discovered that Jerome was incarcerated.  Jordan was placed with Viva, his maternal grandmother.

OCS created case plans for both parents.  Madeline's plan required her to participate in substance abuse treatment, take parenting classes, work on obtaining housing and employment, and maintain and strengthen her bond with Jordan.  Jerome's

---

[1]     We use pseudonyms for all family members to protect their privacy.

[2]     25 U.S.C. § 1903(4) (defining "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe").

[3]     25 U.S.C. §§ 1901-1963.  ICWA establishes "minimum Federal standards for the removal of Indian children from their families and [for] the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture."  25 U.S.C. § 1902.

plan directed him to make contact with OCS, obtain a substance abuse assessment, and attend parenting classes. OCS reviewed and updated each parent's case plan throughout the case. OCS involved Madeline in her case planning but made few attempts to include Jerome in his.

OCS primarily directed its efforts towards Madeline throughout the case. These efforts included referring her to residential substance abuse treatment, drug testing, and parenting classes. Caseworkers also arranged visitation for Madeline and Jordan, including a trial home visit. Even when the trial home visit ended after Madeline relapsed and was incarcerated, OCS continued to provide her supervised visitation with Jordan at the jail. A caseworker noted that Madeline was engaged with OCS and remained so even while she was incarcerated, though not to the same extent.

Jerome was incarcerated for much of the duration of this case. Shortly after OCS initially discovered Jerome was incarcerated, in April 2017 a caseworker attempted to arrange a meeting with him, but could not set up an appointment because Jerome was in segregation. A caseworker then visited the jail one month later but was unable to meet with Jerome because the jail went into lockdown. In July a caseworker met with Jerome for the first time, but did not have an opportunity to thoroughly go over his case plan. After this meeting OCS made no documented attempts to contact or visit with Jerome for three months.

In late 2017 Jerome moved from jail to the Alaska Psychiatric Institute (API). OCS tried to contact Jerome twice while he was at API, in November 2017 and January 2018, but did not succeed. Jerome moved back to jail from API in February 2018.

Jerome remained incarcerated until June 2018. During that time OCS tried to schedule a meeting with him once, in March, but he did not attend. The record does not indicate whether Jerome was aware of this meeting or whether OCS contacted the

jail to schedule it beforehand.  OCS also drafted letters to Jerome twice, in April and June, but OCS had "no indication if [the April letter] was mailed or faxed" and the June letter was returned to sender.  And OCS contacted probation officers in early June, apparently attempting to reach Jerome even though he was still incarcerated at that time.

Jerome was released for about a month before he was re-incarcerated in July 2018, but OCS did not try to contact him while he was out of jail.  After Jerome was once again incarcerated, OCS tried to call him at prior phone numbers and sent a letter to his grandmother to try to reach him, not realizing that he was back in jail.  From this time period until April 2019, Jerome remained in custody, and OCS made no other documented attempts to contact him.

Upon his release in April 2019, Jerome went to the OCS office on his own initiative.  A caseworker met with him and discussed permanency for Jordan.  According to OCS records, Jerome was supportive of a guardianship with Viva.  He also indicated he was interested in seeing Jordan, so the caseworker made a referral for family contact.  The caseworker also offered him bus passes.  Jerome and the caseworker did not have enough time to go through his case plan on that day, so the caseworker scheduled a follow-up meeting, which Jerome missed.  The caseworker then reached Jerome by phone in May to reschedule, but Jerome missed the rescheduled meeting as well.  Jerome was re-incarcerated later that month.  He was released in July 2019 and again visited the OCS office on his own initiative, but he was re-incarcerated three days later.

Over the next six months while Jerome was incarcerated, OCS documented no attempts to meet with him for case planning.  OCS's only documented outreach during this period consisted of faxing two letters to the facility where Jerome was incarcerated that notified him of upcoming court hearings and provided contact information for the assigned caseworker.

A different OCS caseworker was assigned to the case in March 2020.  The

caseworker initially did not realize that Jerome was incarcerated and attempted to contact him at the wrong phone number and address. Three months later the caseworker realized Jerome was incarcerated and tried to reach him again, but he declined her call. The caseworker then successfully reached Jerome in early July; they discussed visitation with Jordan and the caseworker provided Jerome with Viva's phone number. According to the caseworker, Jerome explained that he did not want to participate in services, relinquish his rights, or consent to a guardianship if he would continue to be responsible for child support.

In July 2020 Madeline suddenly and unexpectedly passed away. The assigned caseworker contacted Jerome in August; they discussed services for substance abuse, mental health, and anger management, but the caseworker did not believe Jerome wanted to participate. The caseworker also asked Jerome if he was interested in a grief support group to help cope with Madeline's death. Jerome said yes, but OCS could not facilitate this group within the jail. Jerome said that he sometimes tried to call Viva but she did not answer; the caseworker encouraged him to set up a weekly schedule for calls but did not help him prepare or secure one. In September OCS changed the permanency goal from guardianship to adoption. The caseworker spoke with Jerome once more in October; according to the caseworker, Jerome had not spoken to Viva and was still not interested in case planning.

OCS petitioned to terminate Jerome's parental rights in November 2020 based on concerns of abandonment, incarceration, domestic violence, neglect, substance abuse, and mental illness. OCS alleged that Jerome was "incarcerated and unengaged, or released and unengaged for the entirety of this case" and that he had not addressed his safety threats or his incarceration.

The court held a two-day trial in February 2021. All parties, including Jerome, participated by video conference. In May the superior court terminated Jerome's

parental rights. The court concluded that Jordan was a child in need of aid (CINA) due to Jerome's abandonment[4] and incarceration.[5] It noted that Jerome's "cyclical incarceration renders him unavailable to parent [Jordan] and has destroyed any parent-child relationship that may have existed."

The court also concluded that OCS had made "reasonable and active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the family, and those efforts have been unsuccessful." The court acknowledged "lapses in the early year or more of the case where the father was concerned" but observed that "during this time period[,] . . . OCS was concentrating its efforts on the mother, who was actively engaged with the department." Even though OCS records "reflected no actual contact with the father for significant periods of time," the court determined that OCS's efforts were sufficiently active "given the totality of . . . efforts towards the family."

The court further found that OCS had proven beyond a reasonable doubt, supported by expert testimony, that returning Jordan to Jerome was "likely to result in serious emotional and physical damage to [Jordan]." Its finding focused specifically on Jerome's "lengthy history of violence, unaddressed substance abuse, and mental health issues."

Finally, the court found that termination of Jerome's parental rights was in Jordan's best interests, considering Jordan's need for permanency and Jerome's lack of interest in making the life changes necessary to parent a child.

Jerome appeals, arguing that OCS did not make active efforts to reunify him with Jordan and that termination was not in Jordan's best interests.

---

[4]     AS 47.10.011(1).

[5]     AS 47.10.011(2).

## III.   STANDARD OF REVIEW

"Whether OCS made active efforts to provide remedial and rehabilitative services to reunify the family as required by ICWA is a mixed question of law and fact."[6] We review questions of fact for clear error and questions of law, including compliance with CINA rules and ICWA, de novo.[7] "Findings of fact are clearly erroneous if a review of the entire record in the light most favorable to the prevailing party below leaves [us] with a definite and firm conviction that a mistake has been made."[8]

## IV.   DISCUSSION

Under ICWA and the CINA rules, OCS must prove by clear and convincing evidence that it made "active efforts . . . to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful" before parental rights to an Indian child can be terminated.[9] Active efforts "means affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family."[10] These efforts "are to be

---

[6]     *Sam M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 442 P.3d 731, 736 (Alaska 2019) (quoting *Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 314 P.3d 518, 526 (Alaska 2013)).

[7]     *Id.*

[8]     *Id.* (alteration in original) (quoting *Philip J.*, 314 P.3d at 526-27).

[9]     25 U.S.C. § 1912(d); CINA Rule 18(c)(2)(B).

[10]    *Sam M.*, 442 P.3d at 736 (quoting 25 C.F.R. § 23.2 (2019)).

tailored to the facts and circumstances of the case."[11] "As opposed to passive efforts such as simply developing a plan for the parent to follow, active efforts require that the [S]tate actually help the parent develop the skills required to keep custody of the children."[12]

Jerome argues that OCS did not make active efforts because it "failed to maintain sufficient contact with [him], communicate the expectations of his case plans, or offer him adequate contact with Jordan." He emphasizes OCS's "persistent failures to contact him while he was in state institutions" and notes that "caseworkers testifying at trial could point to no evidence that a case plan created for Jerome had ever been shared with him." He also observes that "[d]espite the need for increased visitation" due to Jordan's young age, OCS "never facilitated a visit between Jordan and Jerome."

Under ICWA, OCS must make active remedial efforts even when a parent is incarcerated or their rehabilitation appears unlikely.[13] "But 'circumstances surrounding a parent's incarceration,' including 'the duration of a parent's incarceration and the services possible for incarcerated parents' can have a 'direct bearing on what active remedial efforts are possible.' "[14] We recognize that Jerome's frequent and prolonged periods of incarceration limited OCS's abilities to access him at times and to refer him to services outside of custody. However, Jerome's incarceration does not excuse OCS's lack of meaningful communication with him throughout this case; nor

---

[11] 25 C.F.R. § 23.2.

[12] *Dashiell R. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 222 P.3d 841, 849 (Alaska 2009).

[13] *Doe v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 272 P.3d 1014, 1020 (Alaska 2012) (quoting *A.M. v. State*, 891 P.2d 815, 827 (Alaska 1995), *overruled in part on other grounds by In re S.A.*, 912 P.2d 1235 (Alaska 1996)).

[14] *Id.* at 1021 (quoting *Dashiell R.*, 222 P.3d at 849).

does it excuse OCS's failure to at least attempt to facilitate bonding with Jordan. The record reflects that OCS vacillated between periods of minimal efforts to reach and communicate with Jerome and long stretches of making *no* efforts to communicate with him. Although these efforts improved during the final months of the case, it is hardly surprising that Jerome was not responsive to those efforts after OCS failed to meaningfully attempt to engage him for over three years.

Additionally, aside from a single referral for visitation, OCS made no effort to explore or facilitate visitation or communication between Jerome and Jordan until the months leading up to the termination petition, and its efforts at that time were limited to providing Jerome with the phone number for Jordan's foster parent and encouraging him to set up a telephone visitation schedule. We acknowledge that a variety of factors may impact visitation between parents and a child who is in OCS custody, including the interests and well-being of the child.[15] But here OCS did not explain its utter failure to cultivate any bond between Jerome and Jordan, particularly prior to the COVID-19 pandemic. OCS presented no evidence that Jerome's incarceration prevented visitation altogether, and indeed, OCS facilitated visits between Madeline and Jordan while Madeline was incarcerated. While OCS may have found an opportunity to engage Jerome early on in this case by providing him information about Jordan and actively promoting contact between them, it failed to do so.[16]

OCS attempts to justify providing minimal efforts to Jerome by pointing

---

[15] *Cf. Bob S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 400 P.3d 99, 106 (Alaska 2017) ("OCS can deny visitation based on clear and convincing evidence that the visits are not in the child's best interests." (first citing AS 47.10.080(p); and then citing CINA Rule 19.1(a))).

[16] We do not intend to suggest that this failure precludes OCS from meeting its obligation to make active efforts to reunify Jerome and Jordan in the future.

out that he often appeared unwilling to engage in services and case planning, but the record does not support this contention. We have held that "[f]ailed attempts to contact the parent . . . may qualify as active efforts if the parent's evasive or combative conduct 'rendered provision of services practically impossible.' "[17] But OCS presented little to no evidence that Jerome was "evasive or combative" such that providing services was "practically impossible."[18] The evidence shows that Jerome declined only one or two phone calls throughout the four years of this case. And the record does not demonstrate that Jerome ever affirmatively refused to meet with caseworkers in person. While "[a] parent's demonstrated lack of willingness to participate . . . may be considered in determining whether [OCS] has taken active efforts," a parent's "lack of effort does not excuse OCS's failure to make and demonstrate its efforts."[19]

The shortcomings in OCS's efforts toward Jerome in many ways mirror the insufficiently active efforts in *Clark J. v. State, Department of Health & Social Services, Office of Children's Services*.[20] Here, as in *Clark J.*, OCS failed to meaningfully involve Jerome in case planning, failed to take logical steps to locate or communicate with Jerome while he was in custody, and failed to facilitate visits or even contact with his child.[21] Here, as in *Clark J.*, the assigned caseworker provided Jerome with a phone

---

[17]     *Sylvia L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 343 P.3d 425, 433 (Alaska 2015) (quoting *E.A. v. State, Div. of Fam. & Youth Servs.*, 46 P.3d 986, 990 (Alaska 2002)).

[18]     *Id.*

[19]     *Bill S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 436 P.3d 976, 983 & n.26 (Alaska 2019) (quoting *Sylvia L.*, 343 P.3d at 432).

[20]     483 P.3d 896, 903-04 (Alaska 2021).

[21]     *See id.* at 903.

number for his son's placement and eventually encouraged him to set up a schedule, but "did not assist him in preparing that schedule."[22] And here, as in *Clark J.*, OCS failed entirely to communicate with Jerome for significant periods of time.[23]

Despite these deficiencies, OCS suggests that its "efforts directed at Madeline were an important, arguably determinative, aspect of [OCS's]" obligation to make active efforts. Jerome acknowledges that OCS "focused on [Madeline] in its reunification efforts" but asserts that the efforts directed at Madeline "do not excuse the three years of near-complete inaction" toward Jerome. OCS is correct that efforts directed at one parent are "an important aspect of [OCS's] active efforts to keep the family together"[24] because if the child can "stay with the non-incarcerated parent, it is unlikely the incarcerated parent's rights will be terminated."[25] But OCS's efforts directed toward one parent in this context cannot be an excuse to ignore the other parent altogether. Considering OCS's "involvement in its entirety,"[26] OCS's efforts towards Madeline in this case, while extensive, do not make up for its total lack of meaningful communication with Jerome for over three years and its failure to actively facilitate bonding between Jerome and Jordan throughout this case.

OCS relies on *Dashiell R. v. State, Department of Health & Social Services,*

---

[22] *Id.*

[23] *Id.* at 903-04.

[24] *Dashiell R. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 222 P.3d 841, 850 (Alaska 2009).

[25] *Doe v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 272 P.3d 1014, 1021 (Alaska 2012).

[26] *Lucy J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 244 P.3d 1099, 1114 (Alaska 2010) (quoting *Maisy W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 175 P.3d 1263, 1268 (Alaska 2008)).

*Office of Children's Services*[27] to suggest that its efforts towards Jerome and his family were sufficiently active. But this comparison is inapposite. In *Dashiell R.* OCS informed the incarcerated father about his children, facilitated phone and mail contact with them, and consulted with the father and prison officials about the father's progress.[28] By contrast, OCS did little to provide Jerome information about Jordan or to support contact between the two, made no effort to communicate with Jerome for significant periods, and did not meaningfully inform Jerome of his case plan requirements until the final months of the case. OCS's efforts directed at the father in *Dashiell R.* were substantially more active than its efforts towards Jerome.[29]

Because OCS's efforts to reunite Jerome with Jordan were minimal throughout this case, we reverse the superior court's conclusion that OCS demonstrated active efforts to reunite the family.[30]

## V. CONCLUSION

We REVERSE the superior court's active efforts conclusion, VACATE the order terminating Jerome's parental rights to Jordan, and REMAND this case for further proceedings consistent with this decision.

---

[27]  222 P.3d 841(Alaska 2009).

[28]  *Id.* at 849-50.

[29]  *See id.*

[30]  Because this determination is dispositive, we do not address Jerome's other argument: that the superior court erred by failing to consider whether guardianship instead of termination was in Jordan's best interests. *See* CINA Rule 10.1(b)(2) (requiring court to "postpone disposition until the court finds that active efforts have been made").